UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ALBERTO D. BTESH, as Guardian of
RONALD S. BTESH,

               **Plaintiff,**

-vs-                                        **Case No.  6:10-cv-71-Orl-19DAB**

CITY OF MAITLAND, FLORIDA, REBECCA
DENICOLA, and GARY CALHOUN,

               **Defendants.**
_____

# ORDER

This case comes before the Court on the following:

1.      First Motion for Partial Summary Judgment by Defendant City of Maitland, Florida (Doc. No. 105, filed Apr. 15, 2011);

2.      Supplement to First Motion for Partial Summary Judgment by Defendant City of Maitland, Florida (Doc. No. 107, filed Apr. 18, 2011);

3.      Stipulation as to Medical Records by Defendant City of Maitland, Florida (Doc. No. 112, filed Apr. 29, 2011);

4.      Motion for Summary Judgment by Defendant Rebecca Denicola (Doc. No. 113, filed May 3, 2011);

5.      Motion for Summary Judgment by Defendant Gary Calhoun (Doc. No. 114, filed May 3, 2011);

6.      Second Motion for Partial Summary Judgment by Defendant City of Maitland, Florida (Doc. No. 119, filed May 4, 2011);

7.     Response to Defendant City of Maitland's First Motion for Partial Summary Judgment by Plaintiff Alberto D. Btesh (Doc. No. 124, filed May 16, 2011);

8.     Notice of Filing of Exhibit Q to Response to Defendant City of Maitland's First Motion for Partial Summary Judgment by Plaintiff Alberto D. Btesh (Doc. No. 125, filed May 17, 2011);

9.     Notice of Filing of Exhibit D to Response to Defendant City of Maitland's First Motion for Partial Summary Judgment by Plaintiff Alberto D. Btesh (Doc. No. 126, filed May 17, 2011);

10.     Notice of Filing of Exhibit S to Response to Defendant City of Maitland's First Motion for Partial Summary Judgment by Plaintiff Alberto D. Btesh (Doc. No. 127, filed May 17, 2011);

11.     Notice of Filing of Exhibit R to Response to Defendant City of Maitland's First Motion for Partial Summary Judgment by Plaintiff Alberto D. Btesh (Doc. No. 128, filed May 17, 2011);

12.     Motion to Strike Exhibit B of Plaintiff's Response in Opposition to City of Maitland's First Motion for Partial Summary Judgment by Defendant City of Maitland, Florida (Doc. No. 129, filed May 20, 2011);

13.     Supplements to Previously Filed Documents by Plaintiff Alberto D. Btesh (Doc. No. 130, filed May 20, 2011);

14.     Reply to Response in Opposition to First Motion for Partial Summary Judgment by Defendant City of Maitland, Florida (Doc. No. 131, filed May 31, 2011);

15.     Response in Opposition to City of Maitland's Second Motion for Partial Summary

Judgment by Plaintiff Alberto D. Btesh (Doc. No. 132, filed June 2, 2011);

16.   Response in Opposition to Gary Calhoun's Motion for Summary Judgment by Plaintiff Alberto D. Btesh (Doc. No. 133, filed June 2, 2011);

17.   Response in Opposition to Rebecca Denicola's Motion for Summary Judgment by Plaintiff Alberto D. Btesh (Doc. No. 134, filed June 2, 2011);

18.   Notice of Filing of Exhibit U on Disk by Plaintiff Alberto D. Btesh (Doc. No. 135, filed June 3, 2011);

19.   Reply to Plaintiff's Response in Opposition to Motion for Summary Judgment by Defendant Rebecca Denicola (Doc. No. 136, filed June 13, 2011);

20.   Reply to Response in Opposition to Motion for Summary Judgment by Defendant Gary Calhoun (Doc. No. 137, filed June 13, 2011);

21.   Reply to Response in Opposition to Second Motion for Partial Summary Judgment by Defendant City of Maitland, Florida (Doc. No. 138, filed June 16, 2011);

22.   Copy of Audio Recording of 911 Phone Call, filed by Defendant City of Maitland, Florida (Doc. No. 139, filed June 20, 2011); and

23.   Notice of Filing of Deposition Transcript of David Manuel by Plaintiff Alberto D. Btesh (Doc. No. 143, filed June 29, 2011).

## Background

### I.  Undisputed Facts

This case arises from the shooting of Ronald Btesh ("Btesh"), a 55 year old man who suffers from schizophrenia and has the mental capacity of a 9 year old, by Defendant Rebecca Denicola, a police officer for Defendant City of Maitland, Florida ("City of Maitland"), on December 22,

2008.  (Doc. No. 72-5 at 5-6, 8, filed Jan. 5, 2011; Doc. No. 105-9 at 5, 9, filed Apr. 15, 2011.)

Plaintiff Alberto D. Btesh ("Plaintiff"), the guardian of Ronald Btesh, (Doc. No. 72-2 at 2-4), brings

this action against City of Maitland, Officer Denicola, and Gary Calhoun, the Chief of Police of the

City of Maitland, for damages arising out of the shooting of Btesh.  (Doc. No. 72.)

### A.  Prior Emergency Responses Regarding Btesh

The Maitland Police Department was dispatched to Btesh's residence following 9-1-1 calls

on several occasions prior to December 22, 2008.  The Maitland Police Department incident reports

corresponding to those emergency responses documented Btesh's mental condition.  On September

6, 1998, the Maitland Police Department was dispatched to Btesh's residence following a verbal

dispute between Btesh and his live-in caregiver of 26 years, Nohemy Castelblanco, and later that

day following a battery by Btesh on Castelblanco.  (Doc. No. 72-3 at 2-3; Doc. No. 131-6 at 4.)  The

incident report indicated that Btesh had a mental condition, was under the care of a psychiatrist, and

had "visions" of acts that do not occur.  (Doc. No. 72-3 at 3.)

Another incident report dated April 9, 2007, noted that Btesh took several medications to

control hallucinations, delusions, and violence.  (Doc. No. 72-4 at 2.)  The report also documented

Castelblanco's observations that Btesh had been hallucinating, hearing voices, punching the walls,

and screaming at her.  (*Id.*)

On August 24, 2008, the Maitland Police Department responded to Btesh's residence

regarding an alleged battery.  (Doc. No. 72-5 at 3.)  The reporting officer observed that Btesh was

"mentally infirm and [that] a coherent conversation was not possible."  (*Id.* at 2-3.)  The incident

report noted that Btesh was speaking "incoherent [g]ibberish" and that an officer was unable to

obtain Btesh's attention.  (*Id.* at 3.)

On November 16, 2008, approximately five weeks prior to the incident at issue in this case, the Maitland Police Department responded to Btesh's residence following a complaint by Castelblanco documented as an "unknown disturbance." (Doc. No. 72-6 at 2.) The corresponding incident report stated that according to Castelblanco, Btesh heard voices telling him to harm himself and kicked down Castelblanco's bedroom door. (*Id.* at 3.)

In addition to the Maitland Police Department incident reports, Computer Aided Dispatch ("CAD") Incident Reports documented the 9-1-1 calls and communications between emergency dispatchers and police officers responding to Btesh's residence in April 2007, August 2008, and November 2008. (Doc. No. 72-4 at 6-7; Doc. No. 72-5 at 8-9; Doc. No. 72-6 at 7-8.) The CAD Incident Reports noted complaints from Btesh's residence that a 55 year old schizophrenic male was acting aggressively and talking to himself. (*Id.*)

**B. 9-1-1 Calls of December 22, 2008**

On the evening of December 22, 2008, Btesh struck Castelblanco over the head several times, causing her to fall to the floor, and Btesh kicked Castelblanco while saying, "die, die, die."[1] (Doc. No. 105-8 at 3-4; Doc. No. 131-6 at 6.) Castelblanco called 9-1-1, and the following conversation transpired between 9-1-1 dispatcher Michelle McEachern, a communications technician employed by the City of Apopka, Florida ("City of Apopka"),[2] (Doc. No. 132-1 at 19, 31), and Castelblanco:

---

[1] Castelblanco explained to the Florida Department of Law Enforcement a few hours after the shooting of Btesh that Btesh "could have killed" her by kicking her. (Doc. No. 131-6 at 6.)

[2] The relationship between the Cities of Maitland and Apopka with respect to receiving emergency calls and dispatching emergency services is discussed *infra* part I.H.

5

McEachern: 9-1-1.  Do you need police, fire, or medical.

Castelblanco: I need police.

McEachern: Okay.  What's wrong?

Castelblanco: (inaudible)

McEachern: Okay.  You need police or medical?

Castelblanco: No, can the police (inaudible).

McEachern: Okay.  What, what do you need the police for?  What's wrong?

Castelblanco: Please.

McEachern: Ma'am, what's wrong?

Castelblanco: (inaudible)

McEachern: (inaudible) do to you?

Castelblanco: The man (inaudible).

McEachern: He (inaudible) you?

Castelblanco: Yeah.

McEachern: What do you mean?  Did he rape you?

Castelblanco: (inaudible)

McEachern: Okay.  Ma'am, you gotta calm down and talk to me, okay.  I don't, I don't understand you.

Castelblanco: Okay.

McEachern: Okay.  Don't understand you.  What exactly happened?

Castelblanco: (inaudible)

McEachern: Okay.  What exactly happened?

Castelblanco: The man is, is crazy.

6

McEachern: The man is crazy?

Castelblanco: Yeah.

McEachern: Okay.  What did he do to you?

Castelblanco: He attacked me.

McEachern: He attacked you?

Castelblanco: Yeah.

McEachern: Okay.  Did he rape you?

Castelblanco: Yeah.  Attacked me.

McEachern: He, is that what he did?

Castelblanco: Yeah.

McEachern: Okay.  Where is he at?

Castelblanco: Uh.

McEachern: Ma'am, is he a white, black, or Hispanic male?

Castelblanco: (inaudible)

McEachern: Huh?

Castelblanco: (inaudible)

McEachern: Hello?  Hello?

(Doc. No. 119-1 at 2-3.)  The phone call lasted one minute and forty seconds.[3]  (Doc. No. 139.)

---

[3] The Maitland Police Department incident report of August 24, 2008 reported that Castelblanco did not speak, read, or write English.  (Doc. No. 72-5 at 3.)  A 9-1-1 dispatcher working on the evening of December 22, 2008 was fluent in Spanish, but that dispatcher was handling another emergency call at the time of Castelblanco call which was received by McEachern.  (Doc. No. 132-1 at 55.)  A language interpretation service was available to McEachern whereby a remote interpreter could join the emergency call, but there is no evidence of record regarding whether McEachern attempted to activate the language interpretation service

Castelblanco admitted during her deposition that she hung up the phone during this call.  (Doc. No. 105-8 at 4.)  McEachern unsuccessfully attempted to reestablish telephonic communication with Castelblanco.  (Doc. No. 132-1 at 45.)

After hanging up with McEachern, Castelblanco called the residence of Waldo Ramirez to ask him to call 9-1-1.  (Doc. No. 105-8 at 4.)  Castelblanco provided conflicting testimony about whether she spoke to Waldo Ramirez or his wife, Alida Ramirez.  (Doc. No. 131-6 at 9; Doc. No. 105-8 at 4-5.)  In any case, Alida Ramirez called 9-1-1 at an unknown time after Castelblanco called 9-1-1, and the following conversation occurred between Ramirez and McEachern:

McEachern: . . . help you?

Ramirez: Uh, is this the Maitland Police?

McEachern: Yes it is. Can I help you?

Ramirez: Okay.  No, uh, not to me but my friend, uh, she lives and 2-0, 201 Monroe.

McEachern: Yeah.  In apartment 6D?

Ramirez: Yes.

McEachern: What's going on, what's going on, ma'am?

Ramirez: Okay.  She lives at, she take, she take care of this guy that, you know, like this man that is sick.

McEachern: Uh huh.

Ramirez: Mentally sick.  Uh, sometimes he, you know, um, she just called me crying. She said that he tried to um, hit her, whatever.

McEachern: To rape her?

Ramirez: (inaudible) yes.

─────────────────────

when speaking with Castelblanco.  (*Id.* at 54-55.)

McEachern: He did try to rape her?

Ramirez: She needs, yeah.  She need to like you take him to the hospital.

McEachern: Okay.  But we're, we're trying to find her and go to her right now, ma'am.  Okay?  Cause she was, she was not talking to me very good.

Ramirez: Right.  Right.

McEachern: Okay.  So we're over there now.  Can you, can you do me a favor?  Can you call her back on her cell phone and tell her to go outside and meet with the officer[,] if the officer's not with her[,] if she can go outside?

Ramirez: Okay.

McEachern: Okay?

Ramirez: I can call her.

McEachern: Thank you.

Ramirez: Uh huh.  Buh bye.

(Doc. No. 124-9 at 2-3; Doc. No. 132-1 at 31.)

After calling the Ramirez residence, Castelblanco went to the front door of Btesh's apartment to wait for police, who arrived three to five minutes later.  (Doc. No. 105-8 at 6.) According to Castelblanco, Btesh was in his bedroom with the door shut.  (*Id.*)

### C.  Emergency Response of December 22, 2008

Jewel Methias, a communications technician employed by the City of Apopka, Florida ("City of Apopka"), initially dispatched the Maitland Police Department to Btesh's residence on December 22, 2008.  (Doc. No. 132-1 at 7, 33.) Methias dispatched the call as a "Signal 66," meaning a rape,[4] and she told the responding officers that dispatch was "still obtaining information."  (*Id.* at 38.)

---

[4] Officer Payne testified that a Signal 66 meant "a rape, sexual assault attack."  (Doc. No. 124-3 at 2.)

Methias explained that she dispatched the call as a rape because McEachern made that classification in the CAD entry and told her that the call was "a rape." (*Id.* at 33, 38, 40.)

Methias testified that she first learned of Ramirez's call after she initially dispatched Castelblanco's call to the police and as she transferred dispatch duties to John Halaychik when he returned to the Maitland dispatch desk at 11:24 p.m.,[5] (Doc. No. 132-1 at 20, 58-59), six minutes after the initial CAD entry at 11:18 p.m., (Doc. No. 143-1 at 67). Methias did not know precisely when Ramirez spoke to McEachern or when, if ever, any of the information provided by Ramirez to McEachern was dispatched to the police officers responding to Btesh's residence. (Doc. No. 132-1 at 86-87.) In addition, Methias could not determine from the exhibits presented at her deposition, including the CAD report from December 22, 2008,[6] when Btesh was shot relative to the timing of the 9-1-1 calls by Castelblanco and Ramirez. (*Id.* at 96.)

According to Officer Payne, Officer Doug Lawson responded to the dispatch by stating that he was "51," meaning en route, and Officer Denicola gave the same response. (Doc. No. 124-3 at 2; Doc. No. 143-1 at 67.) Lieutenant John Schardine then requested that Officer Payne respond to the scene, and Officer Payne acknowledged that request. (Doc. No. 124-3 at 2.) Officer Denicola recalled the dispatcher stating that a 9-1-1 call was received from "a female who was apparently sexually battered by an unknown person possibly still in the apartment." (Doc. No. 105-9 at 7.) Officer Denicola also testified that an unidentified officer requested additional information over the

---

[5] Methias explained that John Halaychik was assigned to dispatch calls to the City of Maitland on the night of the incident and that she dispatched the emergency call to Btesh's residence because Halaychik was away from his desk when the emergency call was received. (Doc. No. 132-1 at 20.)

[6] This report is not in the evidentiary record before the Court.

police radio and that the dispatcher advised that the emergency call had disconnected.[7]  (*Id.*)

**D.  Flagging of Residences**

The City of Apopka computer dispatch system permitted addresses to be "flagged" with information that would "come up" when the dispatcher entered the flagged address into the system. (Doc. No. 132-1 at 67.)  Btesh's residence was not flagged in the CAD report viewed by Methias when she dispatched the police to Btesh's residence on December 22, 2008.  (*Id.* at 68.)

According to Methias, addresses were flagged by dispatch supervisors upon the request of police.  (*Id.*)  Chief Calhoun similarly testified that police officers could request that an address be flagged for a specific issue.  (Doc. No. 105-5 at 6.)  Chief Calhoun could not recall during his deposition ever requesting that an address be flagged due to a resident's mental handicap.  (*Id.* at 7.)  David Manuel, the Deputy Chief of Operations for the Maitland Police Department, testified that residences had been flagged for the presence of a mentally ill person by the Maitland Police Department prior to December 22, 2008.  (Doc. No. 143-1 at 6, 48.)  The Maitland Police Department had no official policy or procedure in December 2008 requiring addresses to be flagged due to the presence of a mentally handicapped individual.  (Doc. No. 105-5 at 9; Doc. No. 143-1 at 49.)

Separate from the flagging of addresses, the computer dispatch system allowed dispatchers to search for prior emergency assistance calls at a particular address.  (Doc. No. 132-1 at 68.) Methias explained that when dispatching a reported rape or sexual battery, it was "not common" for her to determine on her own if any prior incidents occurred at a residence.  (*Id.*)  Instead, police officers would ask Methias "most of the time" if there had been any prior calls to the address, at

---

[7] Methias testified that she told the responding officers that dispatch was unable to get an answer from the telephone at Btesh's residence.  (Doc. No. 132-1 at 45.)

which point Methias would provide the information requested.  (*Id.* at 68.)  Methias stated that at

the time she dispatched police to Btesh's residence on December 22, 2008, she did not know if there

had been any prior requests for emergency assistance at Btesh's residence.  (*Id.*)

Officer Denicola testified that prior to December 22, 2008, she had never requested that an

address be flagged by dispatch, she had never been instructed on how to flag an address, and she had

not responded to a call where dispatch told her the address was flagged.  (Doc. No. 105-12 at 23.)

Officer Denicola further stated that prior to the shooting of Btesh, she had never been instructed that

an address could be flagged because a resident was mentally ill.  (Doc. No. 105-12 at 24.)  On the

other hand, she recalled asking dispatchers for information about prior incidents when the subject

address seemed familiar to her, and she testified that other police officers asked the same question

of dispatchers.  (Doc. No. 105-12 at 23-24.)  However, there is no evidence of record that Officer

Denicola or any other police officer asked Methias or any other dispatcher on December 22, 2008.

if there had been any prior incidents at Btesh's residence.

### E.  Shooting of Btesh

Officer Denicola had not previously responded to Btesh's residence, and neither Officer

Denicola nor Officer Payne knew of Btesh's mental handicap at the time they responded to Btesh's

residence.  (Doc. No. 105-9 at 6-7; Doc. No. 105-11 at 28-29; Doc. No. 124-3 at 4.)  Officers

Denicola and Payne arrived at Btesh's apartment complex about a minute and a half after the initial

dispatch and exited their vehicles at the same time.  (Doc. No. 105-10 at 11; Doc. No. 105-9 at 20-

21.) Officers Denicola and Payne had previously responded to calls together but had not previously

responded to a forcible felony call together.  (Doc. No. 105-9 at 13.)

Officers Denicola and Payne did not speak to each other when they first exited their cars.

(*Id.* at 21.)  Officer Denicola testified that she "t[ook] charge of the scene" as "lead" officer.  (*Id.* at 20-21.)  Officer Denicola explained that although she did not tell Payne that she was taking the "lead" role, the roles were "dictated" by her actions.  (*Id.* at 21.)  According to Officer Denicola, Officer Payne was her backup during the incident.[8]  (*Id.* at 20.)

Officer Denicola was familiar with the apartment complex where Btesh lived based on prior responses to calls at that complex.  (*Id.* at 23.)  Btesh's apartment was on the second floor of the apartment complex, and Officer Denicola observed that the door to Btesh's apartment was open as she approached the stairwell to the second floor.  (*Id.* at 21-22.)  After clearing the area behind the stairwell, Officers Denicola and Payne proceeded up the stairs toward Btesh's apartment with their guns drawn.  (*Id.* at 26-27; Doc. No. 105-10 at 1.)

When Officer Denicola reached halfway up the steps, Castelblanco emerged from Btesh's apartment.  (Doc. No. 105-10 at 1.)  Officer Denicola observed "that [Castelblanco] was upset [and] that something apparently happened."  (*Id.*)  Castelblanco lifted up her hair, and Officer Denicola saw a black and blue bump and bruise on the left side of Castelblanco's forehead which appeared recently inflicted.[9]  (*Id.* at 2.)  Castelblanco stated, "he's crazy, he's crazy," and Officer Denicola responded by asking if anyone was in the apartment.  (*Id.* at 3.)  Castelblanco responded, "[h]e's

---

[8] Chief Calhoun testified that the assignment of roles as "primary" or "backup" is typically determined by the zone of the city requiring police response and the officer assigned to patrol that zone.  (Doc. No. 105-3 at 10.)  Btesh's residence was in Zone 4, and Officer Denicola was assigned to Zone 4 on December 22, 2008.  (*Id.*; Doc. No. 105-9 at 10.)

[9] Shortly after the shooting of Btesh, Castelblanco told officers from the Florida Department of Law Enforcement that Btesh hit her on the head and that she had a bump there.  (Doc. No. 131-6 at 7.)  Castelblanco maintained during her deposition over two years later that she did not have any bruises on her body when the police arrived and that she did not have a "big lump" on her forehead.  (Doc. No. 105-8 at 11.)  However, Plaintiff acknowledges in his Response in opposition to Denicola's Motion for Summary Judgment that Castelblanco did in fact have a "small lump on her upper right forehead."  (Doc. No. 134 at 2.)

crazy, he's crazy," and pointed inside the apartment. (*Id.*) Castelblanco testified that while pointing inside the apartment, she stated that Btesh was in the bedroom with the closed door. (Doc. No. 105-8 at 11.) Officer Denicola testified that she understood that the suspected assailant was inside the apartment and that Castelblanco was the victim. (Doc. No. 105-10 at 6.)

Officers Denicola and Payne then continued up the stairs to the front door of Btesh's residence. (*Id.* at 5.) When Officers Denicola and Payne reached the front door of the apartment, Officer Payne requested that Castelblanco go downstairs and wait for additional police officers. (*Id.* at 3, 5.) Officer Denicola could not recall during her deposition whether Castelblanco stated anything in response to Officer Payne. (*Id.* at 5.) Officer Denicola did not ask Castelblanco if she had been sexually assaulted, if the suspect inside the apartment had any weapons, or what Castelblanco meant when she said "he's crazy." (Doc. No. 105-11 at 28.)

From the front door Officer Denicola heard nothing inside the apartment. (Doc. No. 105-10 at 8.) Officer Denicola twice called out, "Maitland Police Department, if there's anyone in here, come out now." (*Id.*) Hearing no response, Officer Denicola entered the apartment, and Officer Payne stood in the front doorway. (*Id.* at 9; Doc. No. 124-3 at 2.) Officers Denicola and Payne both had their guns drawn. (Doc. No. 124-3 at 2.) According to Officer Denicola, she instructed Officer Payne to watch the hallway, and Officer Payne responded affirmatively. (Doc. No. 105-10 at 16-17.) Castelblanco maintained that Officers Denicola and Payne were "talking fast" and "arguing," but she could not understand what they were saying to each other. (Doc. No. 105-8 at 13.)

Approximately ten seconds after entering the apartment as Officer Denicola prepared to clear the kitchen and living room area, she observed that the door to Btesh's bedroom "flew open violently" and hit the wall. (Doc. No. 105-10 at 17-18.) Btesh then appeared in the bedroom

doorway with his hands closed together near his chest,[10] and Officer Denicola stated, "stop, show me your hands."  (*Id.* at 17-18; Doc. No. 126 at 3.)   Officer Denicola explained that she was concerned Btesh was hiding a knife or another type of weapon in his hands and that because Btesh was "very tall,"[11] he "could conceal any type of weapon in" his hands.  (Doc. No. 105-11 at 21.)

Btesh looked in the direction of Officer Denicola and spoke words that she did not understand.[12]  (Doc. No. 105-10 at 18-19.)  According to Castelblanco, Btesh "got really violent" and "shouted very loud, 'what are you doing here, get out of here.'"  (Doc. No. 131-6 at 8.)  Btesh then "came out the door and aggressively came flying down the hallway" with his hands in the same position, closed together near his chest.  (Doc. No. 105-10 at 18, 24; Doc. No. 113 at 21.)  Officer Denicola observed from the expression on Btesh's face that he appeared agitated, aggravated, and upset.  (Doc. No. 105-10 at 21.)  At this point, Officer Denicola recalled being in a "cover" position behind a wall with the right side of her body exposed to the front door and that Officer Payne was somewhere to Officer Denicola's right in the direction of the front door.  (*Id.* at 20; Doc. No. 105-11

----

[10] Officer Denicola testified that Btesh's hands were "closed together" and "[o]ne over the other."  (Doc. No. 105-10 at 18.)  A still frame from the video recording of Officer Denicola's deposition shows Officer Denicola recreating the position of Btesh's hands and indicating that Btesh's arms were bent upward at the elbows and that his hands met at the center of his chest.  (Doc. No. 126 at 3.)

[11] Officer Denicola recalled that Btesh was between 6' and 6'3" tall and weighed between 250 and 300 pounds.  (Doc. No. 105-10 at 19.)  A medical evaluation form dated November 13, 2008, stated that Btesh was 5'11" and weighed 263 pounds.  (Doc. No. 134-2 at 1.)  Officer Denicola admitted during her deposition that she was 5'9" and weighed 275 pounds in December 2008.  (Doc. No. 105-11 at 27.)  Viewing this information in the light most favorable to Plaintiff, Btesh was two inches taller and weighed slightly less than Officer Denicola at the time of the shooting.

[12] Officer Denicola testified that Btesh may have been speaking a foreign language.  (Doc. No. 105-10 at 19.)  According to Castelblanco, Btesh speaks four languages, "[b]ut he prefers English."  (Doc. No. 105-7 at 8.)

at 2.)

Officer Denicola testified that as Btesh walked toward the front door, his hands remained closed together near his chest, and she was unable to determine whether he had a mental incapacity or possessed any weapons. (Doc. No. 105-10 at 24; Doc. No. 105-11 at 28.) Officer Denicola did not say anything to Btesh or Officer Payne as Btesh walked toward the front door. (Doc. No. 105-10 at 24.) Although Officer Denicola could not see Officer Payne at this point, she observed that Castelblanco was inside the apartment. (*Id.* at 24-25.)

Btesh walked quickly toward Officer Payne and stated words that Officer Payne could not understand. (Doc. No. 124-3 at 3-4.) Officer Payne yelled at Btesh several times to stop, but Btesh was not responsive and continued toward Officer Payne. (*Id.* at 3.) As Btesh approached Officer Payne, she walked backwards until she was outside the front door to the apartment, at which point Btesh shut and locked the front door. (*Id.*) Officer Denicola testified that "a couple of seconds" transpired between the time Btesh opened his bedroom door and the time he reached the front door. (Doc. No. 105-10 at 28.)

When later interviewed by the Florida Department of Law Enforcement, Officer Payne stated that she saw Btesh's hands, that Btesh held no weapons, and that "[i]t was obvious he was not completely there." (Doc. No. 124-3 at 4.) Officer Payne further remarked that she did not "get[] the impression that [Btesh] was going to try to hit [her] in any way." (*Id.* at 5.) At the same time, Officer Payne explained that after she was locked out of Btesh's apartment, she "didn't know if [Btesh] was going to try to do something to [Officer Denicola] or [Castelblanco]." (*Id.* at 3.)

Immediately after hearing the front door slam shut and the deadbolt lock, Officer Denicola heard Officer Payne yell to open the door and either kick or pound loudly on the door. (*Id.* at 28-

29.) Officer Denicola testified that she had no knowledge of how Officer Payne became locked out of the apartment. (*Id.* at 30.) Officer Denicola observed that Btesh and Castelblanco remained in the apartment. (*Id.* at 28.) According to Officer Denicola, Btesh had his back to her when he slammed and locked the front door, and his hands were closed together near his chest when he turned around and came back in her direction. (Doc. No. 113 at 22.)

After turning around from the front door, Btesh "started back at" Officer Denicola, and was "face to face" with Officer Denicola in the hallway connecting the entryway, kitchen, and living room. (Doc. No. 105-10 at 28-29.) Officer Denicola explained that at this point, she was "afraid" due to the fact that Btesh had "cut [her] off" from her backup officer and that she was alone in the apartment with the suspected victim and perpetrator of a sexual battery. (*Id.* at 30.) Officer Denicola further testified that when an officer is separated from a backup officer, the principal officer becomes a better target for a suspect. (*Id.*)

Btesh then aggressively and quickly walked toward Officer Denicola with his hands closed together near his chest in the same position as when he initially walked from his bedroom to the front door. (Doc. No. 105-11 at 4-5.) Officer Denicola ordered Btesh to stop and show his hands, and Btesh stopped for a half second but then continued toward her with his hands in the same position. (*Id.* at 6-7.)

Officer Denicola began to walk backwards in retreat once Btesh was about two and a half feet from her gun. (Doc. No. 105-11 at 5-7.) As Btesh continued toward Officer Denicola and as Officer Denicola continued to walk backwards, she fired a shot into Btesh, aiming for center mass. (*Id.* at 7-8.) Btesh did not slow down and kept walking toward Officer Denicola after the first shot, and Officer Denicola fired a second shot. (*Id.* at 11-12.) Btesh continued toward Officer Denicola

17

after the second shot, and she fired a third shot.  (*Id.* at 12.)  After the third shot, Btesh stopped,

turned around, went into his bedroom, and slammed the door shut.[13]  (*Id.* at 11-12.)

Officer Denicola explained that based on Btesh's walking toward her aggressively with his

hands closed together near his chest, Btesh's failure to obey commands, the suspected sexual battery,

and the fact that Officer Payne was locked outside the apartment, she "had no other choice" but to

fire upon Btesh.  (*Id.* at 9.)  Officer Denicola surmised that had Btesh grabbed her, he could have

taken her gun away and seriously injured or killed her or others.  (*Id.* at 26.)

---

[13] Castelblanco told Florida Department of Law Enforcement investigators a few hours after the shooting that Btesh came out of his bedroom, locked the front door, and then approached the officer who shot him.  (Doc. No. 131-6 at 8.)  Castelblanco testified to a different version of events during her deposition over two years later.  Castelblanco stated that Btesh opened his bedroom door, appeared with his arms crossed and his hands underneath his armpits, told the officers to go away, did not move away from bedroom doorway, and did not lock the front door to the apartment.  (Doc. No. 105-8 at 13-17.)  Castelblanco also maintained that Officer Payne, not Officer Denicola, shot Btesh and that Officer Denicola was not present during the incident.  (*Id.* at 17, 23-25.)  After receiving this testimony, counsel for both parties agreed to terminate Castelblanco's deposition.  (*Id.* at 25-26.)

Plaintiff has not relied upon Castelblanco's deposition testimony in his briefs opposing the pending Motions for Summary Judgment.  According to Plaintiff's Response in opposition to Officer Denicola's Motion for Summary Judgment, Btesh left his bedroom door, locked the front door to the apartment, and walked back toward Officer Denicola, at which point, Officer Denicola shot Btesh.  (Doc. No. 124 at 3-4.)  Plaintiff has described the position of Btesh's hands based on Officer Denicola's deposition testimony and does not assert that Castelblanco's testimony presented a materially different account of the position of Btesh's hands.  (*Id.* at 3.)  Plaintiff also has acknowledged that at the time Officer Denicola shot Btesh, his hands were in the same position as when he passed Officer Denicola on his way from his bedroom to the front door.  (*Id.* at 4.)

According to Plaintiff, Castelblanco "seemed genuinely confused and incompetent to testify" during her deposition.  (Doc. No. 134 at 2.)  Plaintiff does not contend that any portion of Castelblanco's deposition creates a genuine issue of material fact.  In light of Plaintiff's representations to the Court and the contradictions between Castelblanco's deposition testimony and all other evidence of record, Castelblanco's deposition testimony regarding the identity of the shooting officer and Btesh's movements inside the apartment prior to the shooting will not be considered by the Court in the analysis of the pending motions.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

According to Officer Denicola, Castelblanco did not say anything to her or Btesh after Btesh locked the apartment door.  (*Id.* at 17.)  Officer Denicola estimated that approximately five or six minutes elapsed from the time she arrived at the scene until the time she shot Btesh.  (*Id.* at 19.)  Pursuant to the CAD incident report from December 22, 2008, no more than eight minutes elapsed from the time Officer Denicola arrived on scene until the time of the shooting.[14]  Officer Denicola further maintained that at the time she shot Btesh, she did not know that he was unarmed or that he had any mental incapacity.  (Doc. No. 105-12 at 17; Doc. No. 105-11 at 28.)

Following Officer Denicola's shots and Btesh's retreat into his bedroom, Officer Denicola repositioned herself to cover Btesh's bedroom door.  (Doc. No. 105-11 at 14.)  Officer Payne then gained entry into the apartment by kicking the door open.[15]  (*Id.* at 15.)  Sergeant Brad Diller entered the apartment approximately thirty seconds later, and he took the lead in entering Btesh's bedroom.  (*Id.* at 19.)  Btesh was found lying on a bed with his hands closed together.  (*Id.* at 20.)  Sergeant Diller twice ordered Btesh to open his hands, and Btesh complied following the second command.  (*Id.*)  Nothing was found in Btesh's hands.  (*Id.*)  Officer Doug Lawson, who was a trained member of the Crisis Intervention Team ("CIT"), acknowledged the 9-1-1 dispatch to Btesh's residence and provided assistance to Btesh after the shooting and the scene was secured.  (Doc. No. 105-12 at 30;

---

[14] Pursuant to the portions of the CAD report of December 22, 2008, read aloud during the depositions filed in the evidentiary record, Officers Denicola and Payne reported arriving at the scene at 11:20 p.m.  (Doc. No. 143-1 at 68-69.)  At 11:24 p.m., both Officers Payne and Denicola radioed to dispatch that they were "10-4," meaning okay.  (Doc. No. 105-13 at 15-16.) It is unclear when the 11:24 transmissions occurred relative to the shooting of Btesh.  (*Id.* at 15.) At 11:28 p.m., Officer Payne radioed that she was "10-4," and a separate CAD entry at 11:28 made by an unknown person indicated that there was a shooting.  (*Id.* at 18.)

[15] Officer Payne explained that she reentered the apartment with her taser drawn because she previously saw that Btesh had no weapons in his hands.  (Doc. No. 124-3 at 4.)  Officer Payne also stated that "[i]t was obvious that [Btesh] was not completely there because he did [not] even react to the fact that we had our guns drawn on him."  (*Id.*)

Doc. No. 124-3 at 2, 7.)

### F.  Training of Officers to Handle Situations Involving the Mentally Ill

The Maitland Police Department implemented a CIT policy on February 6, 2001.  (Doc. No. 72-7 at 2-4.)  The CIT policy provides in part:

> It shall be the policy of the Maitland Police Department to participate in the Central Florida Crisis Intervention Team.  Specially trained officers will respond to calls involving the mentally ill in crisis and explore alternatives to arrest where appropriate.

(*Id.* at 2.)

Under the CIT policy, a CIT member "[w]hen available[,] . . . shall respond to all calls or incidents involving a potential Baker Act or any other call involving a confirmed or suspected mentally ill person in crisis."  (*Id.* at 3.)  The CIT policy further directs that "[i]n-progress calls will be dispatched to the closest unit and may be reassigned to the CIT officer when the situation has stabilized."  (*Id.*)

Police officers volunteered to serve on the CIT, and members of the CIT were selected by the police chief.  (*Id.* at 3; Doc. No. 105-5 at 7.)  Officer Denicola had not received CIT training.  (Doc. No. 105-12 at 30.)  Officer Denicola testified that she had not previously responded to a call involving a violent forcible felony where she knew that the alleged assailant was mentally ill and that she had not received training from the Maitland Police Department on how to handle such a situation.  (Doc. No. 105-11 at 29-30.)  However, Officer Denicola stated the Maitland Police Department had trained her on how to respond to a call involving a mentally ill person.  (Doc. No. 105-12 at 28.)  Officer Denicola recalled from her field training that it was appropriate to assess the scene, remove any weapons or items that might be used as a weapon, bring the mentally ill person to a safe area, find out if that person wanted to hurt himself or others, and then take appropriate

action.  (*Id.*)  In addition to her training regarding the mentally ill, Officer Denicola had been trained

in police tactics and the use of force.  (Doc. No. 105-11 at 27.)

Prior to December 22, 2008, Officer Denicola had responded to incidents involving mentally

ill persons.  (Doc. No. 105-12 at 25.)  Officer Denicola explained during her deposition that when

dealing with an individual known to be mentally ill, she would try to calm the person and develop

trust.  (*Id.* at 25-26.)  She further stated that she learned to deal with mentally ill persons in this

manner through her own experience, not through formal training.  (*Id.* at 27.)

### G.  Probation Status of Officer Payne

At the time of the shooting of Btesh, Officer Payne was on a six-month period of special

probation in lieu of termination imposed by Chief Calhoun following his receipt of two memoranda

from Officer Payne's supervisors, Lieutenants Jeff Harris and J.G. Schardine,[16] reporting deficient

performance in several areas by Officer Payne.[17]  (Doc. No. 124-7 at 1-3; Doc. No. 105-2 at 26.)

Notably, Lieutenant Harris documented one incident where Officer Payne failed to adequately

provide backup for him and another officer during the arrest of a suspected felon.  (Doc. No. 124-5

at 8.)  Instead of backing up the other officers who were attempting to handcuff the suspect, Officer

Payne pointed her taser through a vehicle window at a passenger who was not a suspect.  (*Id.*)

Lieutenant Harris reported that Officer Payne's "actions were not applicable for the situation at

---

[16] Lieutenants John and J. G. Schardine are husband and wife.  (Doc. No. 105-2 at 22.)

[17] Many of Officer Payne's reported performance deficiencies bear no relationship to
Officer Payne's actions in responding to Btesh's residence on December 22, 2008.  For example,
Lieutenants Harris and Schardine reported that Officer Payne failed to properly complete
paperwork, lacked the ability to handle police calls independently, was insubordinate, lacked
initiative, failed to complete traffic stops, made very few arrests, did not handle constructive
criticism appropriately, was abrupt and rude with the public and police department personnel,
and did not operate her police vehicle safety.  (Doc. No. 124-7 at 1-3; Doc. No. 105-2 at 26.)

hand," (*id.*), but Chief Calhoun maintained during his deposition that Officer Payne did not act improperly during this incident, (Doc. No. 105-3 at 22-23).

Lieutenant Harris also reported that he and members of his squad thought that Officer Payne posed a safety threat to herself, other officers, and the public, and Chief Calhoun acknowledged these concerns.[18]  There is no evidence of record that Officer Denicola was among the police officers who felt that Officer Payne posed a danger to others.[19]  In addition, Chief Calhoun testified that "[d]uring the 18 months that [Officer] Payne was employed as an officer with the City of Maitland Police Department, no citizen was harmed or injured as a result of her actions or in[]actions, other than as alleged in this case."  (Doc. No. 114 at 12.)

The memorandum from Chief Calhoun to Officer Payne imposing the term of special probation enumerated several corrective actions expected of Officer Payne, including completion of additional training regarding general officer safety.  (Doc. No. 124-7 at 2.)  Officer Payne

---

[18] Lieutenant Harris reported that his squad members believed Officer Payne was unfit to be a police officer, "devised a plan to self-back each other without utilizing the radio system," and told him that "Officer Payne is simply bringing an unprotected gun to every call and prefer she was not on scene."  (Doc. No. 124-5 at 8.)  Chief Calhoun testified that he was "disturbed" when he read this portion of Lieutenant Harris' memorandum.  (Doc. No. 105-3 at 24.)  Lieutenant Harris also stated in his memorandum to Chief Calhoun that Officer Payne was considered by other officers to be "an on-duty injury or in the line of duty death just waiting to happen."  (Doc. No. 124-5 at 8.)  Chief Calhoun testified that he understood from Lieutenant Harris' memorandum that other officers were concerned about their safety around Officer Payne and believed that Officer Payne was unable to protect herself or others.  (Doc. No. 105-3 at 25-26, 28.)  Chief Calhoun further explained that Lieutenant Harris's statement reflected a potentially unsafe situation for Officer Payne, other officers, and the public.  (*Id.* at 27.)

[19] Officer Denicola provided undisputed testimony that she and Officer Payne "were friends," "worked really good together," and "had a good rapport, better than most people." (Doc. No. 105-12 at 5.)  Further, Officer Denicola could not recall during her deposition whether she knew that other officers had expressed displeasure with Officer Payne's performance prior to December 22, 2008.  (*Id.* at 8.)  Officer Denicola also stated that she did not speak to other officers regarding Officer Payne's placement on special probation.  (*Id.*)

resigned from the Maitland Police Department in April 2009, prior to the end of her special probation period. (Doc. No. 105-4 at 20.) There is no evidence of record that Officer Payne fulfilled any of the corrective actions assigned as part of her special probation.

### H. Interlocal Agreement

At all times material to this case, the City of Maitland and the City of Apopka had an Interlocal Agreement providing that the City of Apopka would dispatch 9-1-1 calls from Maitland residents to the Maitland Police and Fire Departments. (Doc. No. 72-1 at 19-26.) Chief Calhoun did not participate in the negotiation of the Interlocal Agreement. (Doc. No. 105-5 at 3.) Since 1999,[20] all of Jewel Methias's training and supervision had been provided by the City of Apopka. (Doc. No. 132-1 at 91-92.)

According to Chief Calhoun, he had no "specific disciplinary control or direct oversight" of the emergency dispatchers employed by the City of Apopka or the 9-1-1 call center operated by the City of Apopka in December 2008, except that he coordinated with the call center supervisors if there was an issue or concern. (Doc. No. 105-3 at 11-12.) Tony Morolla, a Maitland employee under Chief Calhoun's supervision, was the liaison between the City of Maitland and the 9-1-1 call center. (*Id.* at 12-13.) Chief Calhoun could not recall during his deposition any specific complaints that were raised regarding the dispatching of 9-1-1 calls to the Maitland Police Department prior to the shooting of Btesh, but he was "certain" that Morolla handled any such issues that arose. (*Id.* at 14-15.) Chief Calhoun further asserted that from December 2003 when he became Maitland Police Chief to the date Btesh was shot, there were no incidents where a citizen was harmed or injured as

---

[20] Methias worked as a dispatcher for the City of Maitland until the City of Maitland closed its dispatch center on September 30, 1999. (Doc. No. 132-1 at 90-91.) Thereafter, she worked as a dispatcher for the City of Apopka. (*Id.* at 7.)

a result of an error in the dispatching of a police officer by the dispatch center.  (Doc. No. 114 at 12.)

## I. Expert Opinions[21]

### 1. Andrew J. Scott, III

Plaintiff has submitted the testimony of Andrew J. Scott, III in opposition to Defendants' Motions for Summary Judgment.  Scott served as Police Chief for the city of Boca Raton, Florida, from October 1998 until February 2006.  (Doc. No. 124-15 at 1.)  In that role, he investigated uses of force and deadly force by police officers, was responsible for disciplining officers and assigning training and retraining, and made recommendations for the dismissal of police officers.  (*Id.* at 1-2.) Between 1978 and 1998, Scott served as a patrol officer, detective, sergeant, lieutenant, and Assistant Chief of Police Chief for the city of North Miami Beach, Florida.  (*Id.* at 2.)  Scott was also trained in SWAT tactics.  (Doc. No. 119-26 at 21.)

During his deposition in this matter, Scott was questioned about several opinions disclosed in his expert report which has not been filed in the evidentiary record.  (Doc. No. 119-26 at 14-15.) First, Scott opined that "Officer Denicola used unnecessary excessive force inconsistent with police practices and procedures, and [such force] was not objectively reasonable."  (*Id.* at 17.)  In explaining this opinion, Scott emphasized that Btesh "offered no physical violence toward[] either officer," did not threaten to harm the officers, and did not present a weapon.  (Doc. No. 119-26 at 19.)  Scott later stated that Btesh "gave no indication of being violent, other than he was yelling some words that [Officer Denicola could not] understand [and] appeared to be angry."  (Doc. No. 119-27 at 20.)  According to Scott, Btesh's attack of Castelblanco had no bearing on Officer

---

[21] Neither party challenges the qualifications of either expert to opine in the area of use of force by police officers, and the Court assumes without deciding that the experts are so qualified for purposes of the foregoing analysis.

Denicola's subsequent safety.  (Doc. No. 119-29 at 2.)

Scott also based his finding of excessive force on the fact that Officer Denicola was confronted by an unarmed subject.  (Doc. No. 119-26 at 17-18.)  At the same time, Scott acknowledged that Officer Denicola testified that she was not certain whether Btesh was unarmed and that when Btesh walked by Officer Denicola toward the front door of the apartment, she could not have seen his hands.  (*Id.* at 18; Doc. No. 119-27 at 24.)

Scott further contended that Officer Denicola deficiently failed to keep Btesh in her line of sight once he passed her, (Doc. No. 119-31 at 28-29), and that when Btesh released his hands to lock the door, Officer "Denicola had to have observed that he was not armed."  (Doc. No. 119-29 at 4.)  However, Officer Denicola's undisputed testimony was that Btesh had his back to her when he shut and locked the front door and that Btesh's hands were closed together near his chest when he turned around and walked back toward Officer Denicola.  (Doc. No. 113 at 22.)

Although Scott conceded that Btesh's failure to obey Officer Denicola's commands while walking toward her constituted active resistance to Officer Denicola for which Btesh could have been arrested, (Doc. No. 119-29 at 8-9), Scott maintained that the use of deadly force was not justified because Btesh offered no indication that he had a weapon in his hands.  (Doc. No. 119-30 at 7.)  Scott contended that Officer Denicola's shooting of Btesh would have been justified if Btesh had concealed a deadly weapon in his hands and all other circumstances remained the same.  (Doc. No. 119-29 at 11-13.)

Scott also opined that Officer Denicola should have used non-deadly force on Btesh.  (Doc. No. 119-26 at 21.)  While Scott found it appropriate for Officer Denicola to enter Btesh's apartment with her gun drawn, Scott maintained that Officer Denicola had other options of force besides

deadly force. (*Id.* at 22.) Scott testified that Officer Denicola should have stopped Btesh when he walked toward the front door either by pushing, hitting, or kicking Btesh and then transitioning to her taser. (*Id.* at 23.) According to Scott, such actions would have given Officer Payne additional time "to get engaged . . . as opposed to being forced out of the apartment." (*Id.* at 24.) Scott also stated that Officer Denicola should have never let Btesh reach the front door regardless of whether he was armed, as doing so created a "tactical disadvantage" and constituted a failure to protect Officer Payne. (Doc. No. 119-28 at 7-8.) Scott further contended that Officer Denicola had sufficient time after Btesh locked the front door and turned around toward Denicola to transition to her taser. (Doc. No. 119-31 at 23.) At the same time, Scott stated that Officer Payne's act of backing out of the apartment "was the trigger that caused" Officer Denicola to use deadly force. (Doc. No. 119-27 at 1.)

Scott asserted that Officers Denicola and Payne should have interviewed Castelblanco before entering Btesh's apartment. (Doc. No. 119-26 at 29.) Scott reasoned that because Officers Denicola and Payne had secured the front entrance to the apartment and did not know where the suspect was located inside the apartment, basic law enforcement principles required them to take 30 to 45 seconds to obtain additional information from Castelblanco. (*Id.* at 25-26, 29.) Based on his 23 years experience serving Spanish-speaking individuals as a police officer and police chief in the Miami area, Scott explained that there was a "very real possibility" that Officers Denicola and Payne could have ascertained the true nature of the emergency by speaking to Castelblanco before entering the apartment despite her apparent inability to communicate with the 9-1-1 operator. (Doc. No. 119-27 at 31.) According to Scott, if an officer makes assumptions without conducting "the proper investigation," the situation may "snowball." (Doc. No. 119-28 at 31.)

Scott next asserted that Officer Denicola should have waited for a CIT officer before entering the apartment and that the City of Maitland failed to adequately train her to wait. (Doc. No. 119-26 at 26.) However, Scott acknowledged that there was no evidence of record suggesting that Officer Denicola knew or should have known that Btesh had a mental condition justifying the presence of a CIT officer. (*Id.* at 28.) Scott further conceded that in order to fault Officer Denicola for entering the apartment without waiting for or summoning a CIT officer, the evidence must show that Officer Denicola was aware or should have been aware of the need for a CIT officer. (*Id.*) In addition, Scott agreed that an officer faces greater danger when confronted with a violent, mentally unstable suspect as opposed to a violent but stable suspect who comprehends the officer's commands. (Doc. No. 119-28 at 3-4.)

In support of his opinion that Officer Payne was improperly trained, Scott pointed to Officer Payne's performance issues[22] documented in the memoranda of Lieutenants Harris and J. G. Schardine and the fact that Officer Payne's personnel file[23] indicated that she received no remedial training. (Doc. No. 119-26 at 30-31; Doc. No. 119-27 at 1.) According to Scott, if a personnel file does not reflect the existence of training, the training did not exist "for all intents and purposes." (*Id.*)

Scott also contended that the City of Maitland failed to properly train Officer Denicola in the use of deadly force. In support of this opinion, Scott relied on Officer Denicola's deposition

_____

[22] Scott conceded during his deposition that the reported low officer morale due to Officer Payne's deficient performance did not impact the events at issue in this case. (Doc. No. 119-32 at 6.)

[23] The personnel file of Officer Payne reviewed by Scott and on which he based his opinions about the sufficiency of Officer Payne's training has not been identified in the record by either party.

27

testimony that she "had no other choice" besides shooting Btesh under the circumstances. (Doc. No. 119-31 at 11.) According to Scott, such testimony reveals inadequate training given his opinion that a reasonable officer would not have used deadly force under the circumstances. (*Id.*)

Scott asserted that the shooting of Btesh was directly caused by the deliberate indifference of the City of Maitland to the rights of its citizens. (Doc. No. 124-15 at 3.) In support of this opinion, Scott stated that Officer Payne was unfit to serve as a police officer, that her unfitness was known to Chief Calhoun, the City Manager, the Assistant City Manager, and City Personnel Director, and that despite placing Payne on special probation with conditions, there is no evidence in Payne's personnel file reflecting enforcement of those conditions. (*Id.* at 3-5.) Scott further reasoned that Officer Payne failed in her duties to backup Officer Denicola and that such failure led Officer Denicola to discharge her weapon. (*Id.* at 6-7.) Scott contended that the shooting of Btesh could have been avoided had the City of Maitland terminated Payne instead of placing her on special probation or, alternatively, ensured that she completed the terms of her special probation. (*Id.* at 8.)

Scott also alluded to his review of 48 use of force reports from the Maitland Police Department during Chief Calhoun's tenure from December 2003 until May 2009, none of which concluded that the use of force was unjustified or excessive. (Doc. No. 124-15 at 9.) Scott stated that zero findings of excessive or unjustified use of force among 48 instances is "statistically relevant in that it would be highly improbable that in 48 reported uses of force, that none were unjustified." (*Id.*) Scott explained that these reports indicated a failure to enforce Maitland Police Department policies and procedures and a "very lackadaisical and laissez faire attitude which directly lead to the shooting of [] Btesh." (*Id.* at 10.)

Scott maintained that had the 9-1-1 dispatcher relayed the Ramirez's statements that Btesh

"was crazy" and that he needed "to go to the hospital," the shooting would not have taken place.[24]
(Doc. No. 124-15 at 9.)  Scott also asserted that had Officer Denicola been alerted to the prior
incidents at Btesh's residence through a dispatch flagging system, Btesh would not have been shot.
(Doc. No. 119-31 at 7-8.)

### 2. W. Ken Katsaris

Defendants have submitted the testimony of W. Ken Katsaris in support of their Motions for
Summary Judgment.  Katsaris is a certified Florida Law Enforcement Officer and Instructor who
has taught a variety of law enforcement and corrections subjects for over 30 years at the Pat Thomas
Regional Law Enforcement Academy, including courses in the use of force, deadly force, crisis
intervention, and dealing with mentally ill individuals.  (Doc. No. 119-2 at 1-2.)  In addition,
Katsaris was an instructor in the use of force at the Florida Highway Patrol Academy for over 25
years, and he served as the force and deadly force advisor to the Director of the Florida Highway
Patrol for thirteen years.  (*Id.*)  Katsaris formerly served as a police officer for the city of St.
Petersburg, Florida, a deputy sheriff with the Leon County Sheriff's Officer, a trooper with the
Florida Highway Patrol, and the Sheriff of Leon County, Florida.  (*Id.* at 2.)  He also was the
Department Chairman of the Criminal Justice Program at Tallahassee Community College for ten
years.  (*Id.*)

---

[24] In support of this conclusion, Scott pointed to "Denicola's testi[mony] that had she
known that there was a mentally challenged person at the scene, she would have conducted
herself differently, spoken differently[,] and dealt with Mr. Btesh differently."  (Doc. No. 124-15
at 9.)  Denicola did not so testify.  When asked if she would have responded differently during
the incident had she known that Btesh had a mental incapacity, Denicola responded, "I don't
know."  (Doc. No. 105-11 at 29.)  Denicola later explained how she had dealt with prior
incidents involving mentally ill persons, (Doc. No. 105-12 at 25-27), and it is unknown whether
any of those situations involved a suspected rape or any other facts similar to the incident at
issue.

Katsaris opined that it was inconsequential to the police response whether McEachern inserted the term "rape" into Castelblanco's 9-1-1 call because the police response would have been the same whether Castelblanco reported that she was raped or that she was merely attacked. (Doc. No. 131-7 at 35-36.) Katsaris further asserted that the police response would have been the same regardless of whether information obtained from Ramirez's 9-1-1 call was dispatched to Officers Denicola and Payne before they reached Btesh's apartment. (Doc. No. 131-8 at 22.) According to Katsaris, Castelblanco's request for assistance did not justify initial assignment to a CIT member because the call was reasonably assessed as a violent crime requiring dispatch to officers assigned in the immediate area. (Doc. No. 119-2 at 11.) Katsaris explained that even if Btesh's residence had been flagged with his mental disability, that fact alone would not preclude the occurrence of a violent attack at the same address. (*Id.*)

Kastaris stated that Officers Payne and Denicola properly secured Btesh and his apartment before questioning Castelblanco because they were responding to a suspected violent felony and because Castelblanco indicated that Btesh remained on the scene but was not visible. (*Id.* at 8.) Katsaris also stated that Officers Denicola and Payne reasonably entered Btesh's apartment before waiting for additional officers to arrive. (Doc. No. 131-9 at 8.) Katsaris asserted that the use of deadly force by Officer Denicola on Btesh was reasonable given that Btesh was suspected to have attacked Castelblanco, that Btesh was acting in an aggressive and agitated manner, that Btesh locked Officer Payne outside the apartment, that it was unclear from Officer Denicola's viewpoint whether Btesh was armed, that Btesh would not obey police commands to stop approaching Officer Denicola, and that Officer Denicola retreated and gave Btesh several commands before shooting him. (Doc. No. 119-2 at 9-10.) Katsaris further indicated that Officer Denicola properly used deadly force on

Btesh regardless of whether Btesh had locked Officer Payne out of the apartment.  (Doc. No. 131-10 at 21.)

## II. Procedural History

On January 5, 2011, Plaintiff filed a twelve-count Second Amended Complaint against the City of Maitland, Officer Denicola, Officer Payne, and Chief Calhoun.  (Doc. No. 72.)  Thereafter, the battery claim against Chief Calhoun was dismissed, (Doc. No. 91 at 9, filed Mar. 7, 2011), and Officer Payne was voluntarily dismissed from this case, (Doc. No. 98, filed Mar. 31, 2011).

Plaintiff's claims remaining for adjudication are as follows: (1) violation of 42 U.S.C. § 1983 by the City of Maitland for failing to properly train and supervise police officers; (2) violation of 42 U.S.C. § 1983 by the City of Maitland for failure to properly train and supervise 9-1-1 dispatchers; (3) violation of 42 U.S.C. § 1983 by Officer Denicola for the use of excessive force on Btesh; (4) violation of 42 U.S.C. § 1983 by Chief Calhoun for failing to properly train and supervise police officers; (5) battery by the City of Maitland for the shooting of Btesh; (6) battery by Officer Denicola for shooting Btesh; (7) negligence by the City of Maitland for failure to properly hire, retain, train, and supervise Officers Denicola and Payne; (8) vicarious liability by the City of Maitland for the negligence of Officers Denicola and Payne and Chief Calhoun; (9) negligence by the City of Maitland for failure to properly hire, retain, train, and supervise 9-1-1 dispatchers; and (10) breach of the Interlocal Agreement by the City of Maitland.  (Doc. No. 72.)

Defendants have moved for summary judgment on each remaining count.  (Doc. Nos. 105, 113-14, 119.)  Plaintiff has filed responses in opposition, (Doc. Nos. 124, 132-34), and Defendants filed reply briefs, (Doc. No. 131, 136-38).  In addition, the City of Maitland has moved to strike Exhibit B of Plaintiff's Response in Opposition to its First Motion for Partial Summary Judgment.

(Doc. No. 129.)  As of the date of this Order, Plaintiff has not filed a response opposing the Motion to Strike, and the time for doing so has passed.

## Standard of Review

### I.  Summary Judgment, Generally

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004).  An issue of fact is "material" under the applicable substantive law if it might affect the outcome of the case.  *Hickson Corp.*, 357 F.3d at 1259.  An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party.  *Id.* at 1260.  The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.*; *Anderson*, 477 U.S. at 251-52.

The party moving for summary judgment has the burden of proving that: (1) there is no genuine issue as to any material fact, and (2) it is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party.  *Anderson*, 477 U.S. at 255.  The court may not weigh conflicting evidence or weigh the credibility of the parties.  *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993).  If a reasonable fact finder could draw more than one inference from the facts and that inference creates an issue of material fact, the court must not grant summary judgment.  *Id.*  On the other hand,

32

summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. In addition, when a claimant fails to produce "anything more than a repetition of his conclusory allegations," summary judgment for the movant is "not only proper but required." *Morris v. Ross*, 663 F.2d 1032, 1034 (11th Cir. 1981).

## II. Summary Judgment on Claims of Qualified Immunity

In cases brought under 42 U.S.C. § 1983, consideration of a motion for summary judgment based on qualified immunity is somewhat different than in other cases. In deciding such motion, a court should resolve all issues of material fact in favor of the plaintiff and then answer the legal question whether defendant is entitled to qualified immunity under that version of the facts. *Case v. Eslinger*, 555 F.3d 1317, 1325 (11th Cir. 2009) (quoting *West v. Tillman*, 496 F.3d 1321, 1326 (11th Cir. 2007)). By construing the facts in this manner, the court has "the plaintiff's best case in hand"; therefore, "material issues of disputed fact are not a factor in the court's analysis of qualified immunity and cannot foreclose the grant or denial of summary judgment based on qualified immunity . . . ." *Id.* (quoting *Bates v. Harvey*, 518 F.3d 1233, 1239 (11th Cir. 2008)). Thus, the court "determine[s] the legal issue of whether the defendant was entitled to qualified immunity using the version of facts most favorable to the plaintiff." *Bates*, 518 F.3d at 1239 (citing *Durruthy v. Pastor*, 351 F.3d 1080, 1084 (11th Cir. 2003)).

## Analysis

## I. Motion to Strike Grand Jury Presentment

Plaintiff has attached an unsigned grand jury presentment against the Maitland Police Department ("Grand Jury Presentment") as Exhibit B to the Response in Opposition to the City of

Maitland's First Motion for Summary Judgment.  (Doc. No. 124-2.)  The Grand Jury Presentment finds fault with the dispatching of the 9-1-1 calls of Castelblanco and Ramirez and the actions of Officers Denicola and Payne and the Maitland Police Department on December 22, 2008.  (*Id.*)  The City of Maitland has moved to strike the Grand Jury Presentment, arguing that the findings in the Grand Jury Presentment are inadmissible.  (Doc. No. 129 at 3.)  The Court agrees.[25]

"Florida grand juries are not confined to an indictment function, as is generally the case under federal law."  *Miami Herald Pub. Co. v. Marko*, 352 So. 2d 518, 522 (Fla. 1977).  Florida grand juries may "express the view of the citizenry with respect to public bodies and officials in terms of a 'presentment,' describing misconduct, errors, and incidences in which public funds are improperly employed."  *Id.*

Plaintiff cites the Grand Jury Presentment for the truth of its findings, namely the finding that had the Maitland Police Department trained its employees to flag addresses, Btesh's residence would have been identified in the CAD system as being occupied by a mentally ill individual as well as the address of three recent calls for emergency services for a mentally ill individual.  (Doc. No. 124 at 17; Doc. No. 124-2 at 5.)  Because Plaintiff seeks to admit the Grand Jury Presentment, a document purportedly containing the findings of the Grand Jury, for the truth of the matter asserted, the Grand Jury Presentment is hearsay.  Fed. R. Evid. 801(c).  Thus, the Grand Jury Presentment is inadmissible unless an exception to the hearsay rule applies.  Fed. R. Evid. 802.  The hearsay exception for public records and reports allows for the admission of the following documents in civil

---

[25] Plaintiff has not filed a response in opposition to the Motion to Strike, and the time for doing so has passed.  *See* Local Rule 3.01(b) (directing a party opposing a motion to file a response within fourteen days of service of the motion).  Plaintiff's failure to file a response in opposition to the Motion to Strike raises an inference that Plaintiff does not oppose the Motion. *E.g.*, *Bray & Gillespie Mgmt. LLC v. Lexington Ins. Co.*, 527 F. Supp. 2d 1355, 1371 (M.D. Fla. 2007).

actions for the truth of the matter asserted:

> Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth . . . factual findings resulting from an investigation made pursuant to authority granted by law, *unless the sources of information or other circumstances indicate lack of trustworthiness.*

Fed. R. Evid. 803(8)(C) (emphasis added).  The Court has found only one case addressing the admissibility of Florida grand jury presentments in federal court.  In *LaMarca v. Turner*, 662 F. Supp. 647 (S.D. Fla. 1987), the court cited Federal Rule of Evidence 803(8)(C) in summarily admitting a grand jury presentment finding lax security and prevalent manufacture and use of intoxicants at a prison for the truth of the matter asserted and for the purpose of showing that the prison's warden was on notice of the reported prison conditions.  *Id.* at 655-66.  The court in *LaMarca* did not discuss the trustworthiness prong of Federal Rule of Evidence 803(8)(C), and for this reason, the Court does not find the reasoning in *LaMarca* to be persuasive here.

The factual findings of the Grand Jury Presentment lack sufficient trustworthiness to be admitted in this proceeding for the truth of the matter asserted.  The grand jury based its factual findings on unknown evidence presented by the State of Florida in a non-adversarial proceeding. *See* Fla. Stat. § 905.24 ("Grand jury proceedings are secret . . . ."); *Marko*, 352 So. 2d at 520 ("[T]he testimony and information presented to a grand jury, on which they must rely and report, is potentially one-sided and inaccurate.").  Basic fairness requires that Plaintiff be excluded from introducing the Grand Jury Presentment for the truth of its findings where the Defendants had no opportunity to present argument or evidence to the grand jury or to challenge the evidence presented by the State of Florida.  *Cf. Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1288 (11th Cir. 2008) (affirming the admission of an EEOC determination of discrimination in a Title VII suit, noting that the employer had submitted evidence to the EEOC which was considered in the EEOC's

findings and that the district court gave a proper limiting instruction to the jury).

The advisory committee notes to Federal Rule of Evidence 803 suggest that in determining whether a report is admissible under Rule 803(8)(C), courts should consider, among other factors, any special skill or expertise of the fact finder, whether a hearing is held, and the level on which it is conducted, and any "possible motivation problems." Each of these factors indicates that the factual findings of lay persons based solely on the state's unchallenged evidence as reported in a grand jury presentment are not sufficiently trustworthy to be admitted for the truth of the matter asserted under Rule 803(8)(C).

For the reasons discussed above, the Grand Jury Presentment does not satisfy the trustworthiness prong of Federal Rule of Evidence 803(8)(C) and thus is inadmissible for the truth of the matter asserted. In addition, Plaintiff does not argue, and the Court does not find, any non-hearsay use for the Grand Jury Presentment in the analysis of the pending motions. Moreover, the Court cannot consider the Grand Jury Presentment for any purpose because it is unsigned and because there is no evidence of record that the Grand Jury Presentment was in fact issued as it appears in the unsigned copy filed with the Court. Accordingly, the City of Maitland's Motion to Strike is granted, and the Grand Jury Presentment will not be considered in the Court's analysis of the pending Motions for Summary Judgment.

## II.  Count III: Section 1983 Claim Against Officer Denicola

In Count III of the Second Amended Complaint, Plaintiff asserts a Section 1983 claim against Officer Denicola for excessive use of force on Btesh. (Doc. No. 72 at 25-26.) The parties dispute whether Officer Denicola is entitled to qualified immunity on this claim. (Doc. Nos. 113, 134, 136.)

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To receive qualified immunity, the officer must first show that she acted within her discretionary authority. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).  Officer Denicola acted within her discretionary authority as a member of the Maitland Police Department in using deadly force on Btesh. *See Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004) (finding that a police officer acted within his discretionary authority in shooting a suicidal suspect who attempted to attack the police officer); *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988) (defining discretionary authority to include actions undertaken pursuant to the performance of duties that are within the scope of an officer's authority).  Accordingly, the burden shifts to Plaintiff to show that qualified immunity is not appropriate. *Lee*, 284 F.3d at 1194.

A law enforcement officer is entitled to qualified immunity unless the plaintiff establishes that (1) the facts when viewed in a light most favorable to the plaintiff establish a constitutional violation, and (2) the illegality of the officer's actions was "clearly established" at the time of the incident. *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009) (citing *Pearson v. Callahan*, 129 S. Ct. 808, 815-16, 818 (2009)).  The two prongs of the qualified immunity analysis may be considered in either order. *Id.*  For the reasons discussed below, Plaintiff has failed to satisfy either prong, and Officer Denicola is entitled to qualified immunity and summary judgment on this claim.

### A.  Violation of Btesh's Constitutional Rights

The Court begins by considering whether, based on the facts viewed in the light most

favorable to Plaintiff, the shooting of Btesh by Officer Denicola was an objectively unreasonable use of deadly force violating Btesh's Fourth Amendment rights. *See Oliver*, 586 F.3d at 905 (applying the "Fourth Amendment's 'objective reasonableness' standard" to a claim of improper use of deadly force). "Reasonableness is dependent on all the circumstances that are relevant to the officer's decision to use deadly force, including the seriousness of the crime, whether the suspect poses an immediate danger to the officer or others, whether the suspect resisted or attempted to evade arrest, and the feasibility of providing a warning before employing deadly force." *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (citing *Penley v. Eslinger*, 605 F.3d 843, 850 (11th Cir. 2010)). However, "none of these conditions are prerequisites to the lawful application of deadly force by an officer seizing a suspect." *Penley*, 605 F.3d at 850.

While the totality of the circumstances should be considered, "[p]erspective also is crucial to the analysis[, as] '[t]he only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded.'" *Id.* (quoting *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009)); *see also Graham v. Connor*, 490 U.S. 386, 396 (1989) (explaining that a "standard of reasonableness at the moment applies"). "It is well settled that courts must account 'for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation.'" *Jean-Baptiste*, 627 F.3d at 820-21 (quoting *Graham*, 490 U.S. at 397).

Viewing the facts in the light most favorable to Plaintiff, Officer Denicola reasonably used deadly force on Btesh. A rape or sexual battery was reported at Btesh's residence according to the information dispatched to Officers Denicola, (Doc. No. 132-1 at 38; Doc. No. 105-9 at 7), and Officers Denicola was presented with no evidence prior to the shooting suggesting that the suspected

crime did not actually occur.  Upon approaching Btesh's apartment, Officer Denicola observed that Castelblanco was upset and had recently sustained a head injury, and Castelblanco informed Officers Denicola and Payne that the suspected attacker was inside the apartment and "was crazy."  (Doc. No. 105-10 at 2-3.)  Castelblanco's physical condition and statements were not inconsistent with the suspected rape or sexual battery.  Because the circumstances presented probable cause to believe that the suspect inside the apartment had "committed a crime involving the infliction or threatened infliction of serious physical harm," Officer Denicola was permitted "to use deadly force . . . against a suspect who poses . . . an imminent threat of danger to a police officer or others."  *McCorminck v. City of Fort Lauderdale*, 333 F.3d 1234, 1246 (11th Cir. 2003).  For the reasons discussed below, the circumstances surrounding Officer Denicola at the moment she shot Btesh reasonably indicated that Btesh posed a serious threat of physical injury to Officer Denicola, as well as to Castelblanco who was also present in the locked apartment at the time of the shooting, (Doc. No. 105-10 at 24-25; Doc. No. 131-6 at 8), and who had been attacked by Btesh earlier that evening, (Doc. No. 131-6 at 6).  *See Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007) ("[T]he threat of danger to be assessed is not just the threat to officers at the moment, but also to the officers and other persons if the chase went on." (quoting *Pace v. Capobianco*, 283 F.3d 1275, 1280 n.12 (11th Cir. 2002))).

Btesh's repeated failure to obey the commands of Officers Payne and Denicola objectively indicated that Btesh had dangerous propensities.  *See Garczynski*, 573 F.3d at 1168-69 (concluding that the suspect's refusal to comply with repeated commands to show his hands, among other factors, justified the use of deadly force).  Prior to entering Btesh's apartment, Officer Denicola gave two commands for the suspected assailant to come out of the apartment, and there was no response.  (Doc. No. 105-10 at 8-9.)  When Btesh first appeared to Officer Denicola inside the apartment, he

failed to comply with Officer Denicola's request to stop and show his hands. (*Id.* at 10.) Btesh also failed to comply with Officer Payne's instructions to stop as he aggressively walked toward the front door. (Doc. No. 124-3 at 3.) After locking Officer Payne outside the apartment, Btesh again failed to comply with Officer Denicola's command to stop and show his hands as he aggressively approached Officer Denicola. (Doc. No. 105-11 at 6-7.) The danger presented by Btesh's failure to obey commands was enhanced by the fact that the commands were given while Officers Denicola and Payne had their guns drawn upon Btesh.[26] (Doc. No. 124-3 at 2; Doc. No. 105-11 at 5-7.)

Btesh's angry and aggressive demeanor further indicated that Btesh presented an imminent threat to the safety of Officer Denicola and Castelblanco at the time Officer Denicola shot Btesh. Btesh emerged from his bedroom by thrusting the door open violently and acting in an aggressive and agitated manner[27] as he walked past Officer Denicola to the front door. (Doc. No. 105-10 at 17, 21.) Btesh then locked Officer Payne outside the apartment, leaving Btesh inside with Officer Denicola and Castelblanco, the suspected victim. (*Id.* at 24-25; Doc. No. 131-6 at 8.) W. Ken Katsaris asserted that Btesh's actions were "ominious[] and could only reasonably be determined to be an escalation of his potential threat," (Doc. No. 119-2 at 9), and there is no evidence of record to the contrary.

Although Officers Denicola and Payne did not actually know that Btesh was mentally ill at the time of the shooting, (Doc. No. 105-9 at 6-7; Doc. No. 105-11 at 28-29; Doc. No. 124-3 at 4),

---

[26] Plaintiff concedes, consistent with the testimony of Andrew Scott, that Officers Denicola and Payne "rightfully" entered Btesh's apartment with their guns drawn. (Doc. No. 134 at 8; Doc. No. 119-26 at 22.)

[27] During her interview by the Florida Department of Law Enforcement shortly after the shooting, Castelblanco recalled that Btesh "got really violent" and shouted at Officers Denicola and Payne to leave when they were present in the apartment. (Doc. No. 131-6 at 8.)

objective facts presented at the scene reasonably suggested that Btesh was mentally instable and thus presented "a heightened possibility of threat to the officers and others." *Fernandez v. City of Cooper City*, 207 F. Supp. 2d 1371, 1378 (S.D. Fla. 2002). Btesh's repeated failure to respond to commands from police officers pointing weapons at him and Castelblanco's admonition that Btesh "was crazy" objectively indicated that Btesh was mentally ill. (Doc. No. 105-10 at 3.) According to Andrew Scott, an officer faces greater danger when confronted with a violent, mentally unstable suspect as opposed to a violent but stable suspect who comprehends the officer's commands. (Doc. No. 119-28 at 3-4.)

The reasonableness of Officer Denicola's use of deadly force is further supported by the undisputed testimony of Scott that Btesh resisted arrest by disobeying the commands of Officers Denicola and Payne and by walking toward Officer Denicola with his hands closed together near his chest. (Doc. No. 119-29 at 8-9); *see Jean-Baptiste*, 627 F.3d at 821 (noting that a suspect's resistance of arrest supports a finding that the use of deadly force was reasonable). Although Officer Denicola did not verbally warn Btesh that she would shoot before firing upon him, she and Officer Payne provided unspoken warnings by maintaining their guns drawn while commanding Btesh to stop and show his hands. (Doc. No. 124-3 at 2; Doc. No. 105-11 at 5-7.) Only after Btesh failed to obey Officer Denicola's repeated commands as he quicky and aggressively approached her did Officer Denicola fire her weapon, and Btesh did not stop proceeding toward Officer Denicola until she fired a total of three shots. (*Id.* at 11-12.)

The speed at which the situation evolved inside Btesh's apartment also indicates that Officer Denicola's use of deadly force on Btesh was justified. *See Jean-Baptiste*, 627 F.3d at 821 (noting in support of finding that the shooting officer's use of deadly force was reasonable that the officer

was "suddenly confronted" by the suspect and "forced to decided in a matter of seconds whether to deploy deadly force"); *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1334 (11th Cir. 2004) ("We must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal." (citations omitted)).  Officer Denicola testified that approximately ten seconds elapsed from the time she entered the apartment until the time Btesh opened his bedroom door, (Doc. No. 105-10 at 18), and that "a couple of seconds" transpired between the time Btesh opened his bedroom door and the time he reached the front door, (*id.* at 28).  After turning around from the front door, Btesh "started back at" Officer Denicola, and was "face to face" with Denicola in the hallway connecting the entryway, kitchen, and living room.  (Doc. No. 105-10 at 28-29.)  Btesh only paused for about a half second before he continued walking toward her quickly and aggressively and was shot. (Doc. No. 105-11 at 7, 9.)  In light of the objective indicia of Btesh's violent propensities and Btesh's failure to obey commands as he quickly and aggressively approached Officer Denicola, her decisive deployment of deadly force without an additional warning was a reasonable response to protect herself from the threat of serious bodily harm imposed by Btesh.  *See Jean-Baptiste*, 627 F.3d at 821 (noting that the "feasability of providing a warning before employing deadly force" is a factor to be considered in analyzing the reasonableness of deadly force).

The threat of serious bodily harm to Officer Denicola was not diminished by the fact that Btesh did not hold a weapon in his closed hands because Officer Denicola reasonably had no indication that Btesh was unarmed at the time she fired her weapon.  *See Harrell v. Decatur Cnty., Ga.*, 22 F.3d 1570, 1580-81 (11th Cir. 1994) (Dubina, J., dissenting) (awarding a police officer

42

qualified immunity where the officer shot and killed a felony suspect because the officer reasonably could have believed the suspect was reaching under a car seat for a weapon), *vacated by* 41 F.3d 1494 (11th Cir. 1995) (adopting Judge Dubina's dissenting opinion); *Young v. City of Killeen*, 775 F.2d 1349, 1352-53 (5th Cir. 1985) (holding that the use of deadly force by a police officer was lawful where the officer, who had just observed a drug transaction and ordered the driver of a car to exit the vehicle, observed the driver suddenly reach down for what reasonably could have been a gun). It is undisputed that Btesh's hands remained closed together near his chest when he quickly walked from his bedroom to the front door and that Officer Denicola was unable to determine whether Btesh had any weapons on his person at that time. (Doc. No. 105-10 at 24; Doc. No. 105-11 at 28.) Btesh had his back to Officer Denicola when he locked the front door, thereby preventing her from seeing if he had anything in his hands. (Doc. No. 113 at 22.) Officer Denicola further testified that Btesh's hands were closed together near his chest when he proceeded toward her after locking the front door, (*id.*; Doc. No. 105-11 at 4-5), and there is no evidence of record suggesting that Officer Denicola reasonably could have determined that Btesh was unarmed at the moment she shot him.[28]

Officer Payne remarked to the Florida Department of Law Enforcement after the shooting that she saw Btesh was unarmed and that she felt Btesh was not going to try to hit her. (Doc. No. 124-3 at 4-5.) These statements do not create a genuine issue of material fact regarding the nature of the threat posed by Btesh at the moment Officer Denicola shot Btesh because it is undisputed that Officers Payne and Denicola had different vantage points and because no evidence of record

---

[28] Plaintiff argues in his Response in Opposition to Officer Denicola's Motion for Summary Judgment that Btesh could not have hid a weapon in his "diminutive" hands. (Doc. No. 134 at 10.) There is no evidence of record regarding the size of Btesh's hands.

indicates that Officer Payne conveyed her observations to Officer Denicola prior to the shooting. *See Gill v. Maciejewski*, 546 F.3d 557, 562 (8th Cir. 2008) ("The objectively reasonable standard is viewed from the vantage point of the police officer at the time of arrest or seizure." (citation omitted)).

The threat presented by Btesh to Officer Denicola was at least as great as that presented to the police officer in *Reese v. Anderson*, 926 F.2d 494 (5th Cir. 1991), who justifiably shot a robbery suspect seated in a getaway vehicle from a distance of ten feet. *Id.* at 496, 500. Following the getaway vehicle's abrupt stop, the shooting officer in *Reese* pointed his gun at the persons inside the vehicle and ordered them to raise their hands and exit the vehicle. *Id.* at 500. The shot passenger "repeatedly reached down in defiance of" the police officer's orders to an area that the officer could not see. *Id.* The Fifth Circuit panel ruled that the officer justifiably shot the passenger as he reached down further a second time because it was reasonable to believe that the passenger was reaching for a weapon and because a reasonable officer would "fear for his safety and that of others nearby." *Id.* at 501.

Like the shooting officer in *Reese*, Officer Denicola was attempting to secure the suspected perpetrator of a forcible felony who repeatedly failed to obey commands to show his hands, thereby preventing her from reasonably determining whether the suspect was armed. The imminent danger of a suspect reaching for what reasonably could have been a gun in *Reese* presented at least as much danger as Btesh's threat to Officer Denicola at the moment she fired her weapon. Like the suspect in *Reece*, Btesh reasonably could have been concealing a weapon presenting an imminent threat of harm to the shooting officer and others at the scene. Btesh's angry and aggressive demeanor, suspected attack of Castelblanco, and failure to obey police commands reasonably indicated that had

44

Btesh possessed a weapon, it likely would have been used to inflict deadly harm. "[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." *Jean-Baptiste*, 627 F.3d at 821 (quoting *Long*, 508 F.3d at 581). Therefore, given the totality of the circumstances, the fact that Btesh was actually unarmed, by itself, does not create a genuine issue of material fact regarding the reasonableness of Officer Denicola's use of deadly force.

Plaintiff's expert, Andrew Scott, faults Officer Denicola for failing to conduct a brief interview with Nohemy Castelblanco prior to entering the apartment, (Doc. No. 119-26 at 29), for not using non-deadly force on Btesh when he walked to the front door of the apartment, (Doc. No. 119-26 at 22), and for not transitioning to a taser after Btesh locked the front door, (Doc. No. 119-30 at 23). Plaintiff does not cite, and the Court does not find, any authority that Scott's opinions about Officer Denicola's actions prior to the shooting of Btesh create a genuine issue of material fact regarding the reasonableness of Officer Denicola's use of deadly force on Btesh. When judging the use of deadly force by a police officer, a "standard of reasonableness *at the moment* applies." *Graham*, 490 U.S. at 396 (emphasis added); *see also Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 407 (6th Cir. 2007) (disregarding the events occurring "in the hours and minutes leading up to" the disputed shooting and instead focusing on the "split-second judgments made immediately before the officer used allegedly excessive force" (internal quotation and citation omitted)); *Cole v. Bone*, 993 F.2d 1328, 1333 (8th Cir. 1993) (scrutinizing "only the seizure itself, not the events leading to the seizure, for reasonableness under the Fourth Amendment" because the "Fourth Amendment prohibits unreasonable seizures, not unreasonable or ill-advised conduct in general"); *Greenidge v. Ruffin*, 927 F.2d 789, 792 (4th Cir. 1991) (holding that the objective reasonableness test for

45

excessive use of deadly force in *Graham* requires focus on the very moment the officers make the "split-second judgments" and not on the events leading up to the time immediately prior to a shooting); *Sherrod v. Berry*, 856 F.2d 802, 805-06 (7th Cir. 1988) (stating that in an excessive force case courts should look to the split second before the officer had to decide what to do).

Scott's testimony that Officer Denicola should have employed different police tactics or investigative techniques which *possibly* could have prevented the shooting of Btesh injects impermissible hindsight into the analysis and does not, by itself, permit a reasonable finding that Officer Denicola's use of force was objectively unreasonable under the circumstances at the moment she shot Btesh. *See Graham*, 490 U.S. at 396 (requiring courts to judge the "reasonableness of a particular use of force . . . from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." (internal quotation marks and citation omitted)); *Billington v. Smith*, 292 F.3d 1177, 1190 (9th Cir. 2002) ("[A] plaintiff [may not] establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided."); *Young*, 775 F.2d at 1353 (finding that an officer cannot be liable under Section 1983 for negligently failing to follow protocol resulting in the situation where the officer justifiably used deadly force). Moreover, Scott's statements about the split-second actions Officer Denicola "could have" taken to prevent Officer Payne from being locked outside the apartment and to avoid shooting sound in negligence, (Doc. No. 119-26 at 23), and negligent conduct alone cannot establish an excessive force claim under Section 1983. *See Ansley v. Heinrich*, 925 F.2d 1339, 1344 (11th Cir. 1991) ("[N]egligent conduct alone [cannot] form the basis of a section 1983 claim premised on the fourth amendment.").

In addition, Scott's assessment of the threat posed by Btesh to Officer Denicola fails to

account for the totality of the circumstances affecting Officer Denicola at the moment she fired upon Btesh. Scott testified that Btesh "gave no indication of being violent, other than he was yelling some words that [Officer Denicola could not] understand [and] appeared to be angry," (Doc. No. 119-27 at 20), and that Btesh's attack of Castelblanco had no bearing on Officer Denicola's subsequent safety. (Doc. No. 119-29 at 2.) While Btesh's utterance of unintelligible words or words in a foreign language, by itself, does not justify the use of deadly force, Btesh reasonably posed a threat of serious physical harm to Officer Denicola at the moment she shot Btesh given the dispatch of a suspected rape, Castelblanco's visible injuries allegedly caused by Btesh, Castelblanco's admonition that Btesh "was crazy," Btesh's failure to obey police commands, Btesh's visible anger, and Btesh's quick and aggressive walk toward Officers Payne and Denicola with his hands clasped in front of his chest moments before the shooting. *See McCormick*, 333 F.3d at 1246 (finding a reasonable use of deadly force where the officer had probable cause to believe that the suspect earlier had committed a violent felony, could reasonably perceive that the suspect posed an imminent threat of violence to the officer and other bystanders, and noted that the suspect continued to ignore repeated commands to drop a walking stick held in his hand).

In summary, based on the dispatch of a suspected rape, Catelblanco's physical injuries and upset appearance, Castelblanco's statement that Btesh "was crazy," Btesh's failure to obey repeated commands of armed police officers to stop and show his hands, Btesh's aggressive and angry demeanor, Btesh's locking of Officer Payne outside the apartment, and Btesh's quick and aggressive walk toward Officer Denicola, a reasonable police officer in Officer Denicola's position was justified in using deadly force, as it was reasonably likely under the circumstances Btesh may have seriously injured Officer Denicola or Castelblanco. *See Menuel v. City of Atlanta*, 25 F.3d 990, 995

(11th Cir. 1994) ("From the vantage of an officer whose life is jeopardized, a potential arrestee who is neither physically subdued nor compliantly yielding remains capable of generating surprise, aggression, and death.").  Although Plaintiff does not directly challenge the number of shots fired by Officer Denicola as constituting excessive force, firing three shots was reasonable under the circumstances because Btesh did not stop approaching Officer Denicola until the third shot was fired.  (Doc. No. 105-11 at 11-12); *see Jean-Baptiste*, 627 F.3d at 821 ("A police officer is entitled to continue his use of force until a suspect thought to be armed is 'fully secured.'" (quotation omitted)).  Because the shooting of Btesh did not violate his Fourth Amendment rights under the facts viewed in the light most favorable to Plaintiff, Officer Denicola is entitled to qualified immunity and summary judgment on Plaintiff's Section 1983 excessive force claim.

## B.  Clearly Established Right

Officer Denicola is also entitled to qualified immunity because Plaintiff has not met his burden of establishing that Btesh's clearly established rights were violated by Officer Denicola's use of deadly force.  A plaintiff may demonstrate that a right is clearly established at the time of an incident in one of three ways: (1) "a materially similar case has already been decided, giving notice to the police"; (2) "a broader, clearly established principle should control the novel facts in this situation"; or (3) the "case fits within the exception of conduct who so obviously violates the constitution that prior case law in unnecessary." *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005) (citations omitted).  Clearly established caselaw is limited to the law as interpreted by the Supreme Court of the United States, the Eleventh Circuit Court of Appeals, and the Supreme Court of Florida at the time of the disputed incident.  *Id.* (citation omitted).

Plaintiff does not argue that the facts presented here are materially similar to another case

48

finding a violation of the right to be free from excessive force,[29] and the Court found no such case upon conducting its own research.  Rather, Plaintiff solely relies on the second method of proving a violation of clearly established law by citing *Mercado* for the proposition that "the right to be free from the unreasonable use of deadly force in a situation that required less-than-lethal force was a clearly established principle that any reasonably officer would have" known on December 22, 2008. (Doc. No. 134 at 12-13.)  However, "the principle that officers may not use excessive force to apprehend a suspect is too broad a concept to give officers notice of unacceptable conduct." *Mercado*, 407 F.3d at 1159 (citing *Jones v. City of Dothan*, 121 F.3d 1456, 1460 (11th Cir. 1997)); *see also Coffin v. Brandau*, 642 F.3d 999, 1015 (11th Cir. 2011) ("To find that a broad principle of law clearly establishes the law as to a specific set of facts, 'it must do so 'with obvious clarity' to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.'" (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002))).  Further, Plaintiff does not cite, and the Court does not find, any authority suggesting, that Officer Denicola's actions under the circumstances "so obviously violate[d] the constitution that prior case law in unnecessary."  *Mercado*, 407 F.3d at 1159.  Accordingly, Plaintiff has failed to meet his burden of demonstrating that Btesh's clearly established rights were violated by Officer Denicola.

Andrew Scott and W. Ken Katsaris have provided competing opinions regarding whether

---

[29] Failure to cite a materially similar case finding an excessive use of force is generally fatal to a Section 1983 excessive force claim.  *See Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 926 (11th Cir. 2000) ("In the context of Fourth Amendment excessive force claims, we have noted that generally no bright line exists for identifying when force is excessive; we have therefore concluded that unless a controlling and materially similar case declares the official's conduct unconstitutional, a defendant is usually entitled to qualified immunity." (citation omitted)).

Officer Denicola's use of deadly force on Btesh was unreasonable.  (Doc. No. 124-15 at 1-10; Doc. No. 119-2 at 1-12.)  Notwithstanding the failure of Scott's opinion to account for the totality of the circumstances confronting Officer Denicola at the moment she shot Btesh, *see supra* part II.A, the presence of competing expert opinions on the reasonableness of Officer Denicola's use of deadly force does not, by itself, preclude an award of qualified immunity to Officer Denicola.  *See, e.g.*, *Carswell v. Borough of Homestead*, 381 F.3d 235, 243-44 (3d Cir. 2004) (granting qualified immunity to a police officer who shot a fleeing suspect who ignored orders to stop and charged toward him with no weapons in his hands despite expert testimony that the shooting officer should have physically subdued the suspect without using deadly force); *Edwards v. Gilbert*, 867 F.2d 1271, 1275-76 (11th Cir. 1989) (awarding a sheriff and a correctional officer qualified immunity in a Section 1983 claim arising from a juvenile inmate's suicide despite expert opinion evidence conflicting as to whether officials had properly monitored the juvenile); *see also United States v. DiSantis*, 565 F.3d 354, 364 (7th Cir. 2009) ("Although in some instances expert testimony may assist the jury in determining whether an officer used excessive force, expert testimony is by no means required in all excessive force cases.  Since the question of excessive force is so fact-intensive, the jury will often be in as good a position as the experts to decide whether the officer's conduct was objectively reasonable." (internal citations and quotations omitted)).

In summary, Officer Denicola is entitled to qualified immunity and summary judgment on the excessive force claim against her in Count III of the Second Amended Complaint because Officer Denicola's use of deadly force on Btesh was objectively reasonable based on the facts viewed in the light most favorable to Plaintiff and, alternatively, because Plaintiff has failed to demonstrate that Btesh's clearly established rights were violated under the circumstances.

### III.  Count VII:  Battery Against Officer Denicola

Officer Denicola moves for summary judgment on the battery claim against her in Count VII of the Second Amended Complaint.  (Doc. No. 113 at 16-17.)  "Law enforcement officers are provided a complete defense to an excessive use of force claim where an officer 'reasonably believes [the force] to be necessary to defend himself or another from bodily harm while making the arrest.'" *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. 3d DCA 1996) (quoting Fla. Stat. § 776.05(1)). Plaintiff contends that unlike the analysis of a police officer's use of deadly force under the Fourth Amendment, the state law defense under Section 776.05(1), Florida Statutes, imposes a subjective element that the officer actually hold a reasonable belief that the use of deadly force was reasonable. (Doc. No. 132 at 10.)  Plaintiff acknowledges finding no authority to support this argument, (*id.* at 10 n.5), and the Court's own research indicates that a police officer is entitled the defense under Section 776.05(1) merely by establishing that the use of force was objectively reasonable.  *See Sanders*, 672 So. 2d at 47 ("A battery claim for excessive force is analyzed by focusing upon whether the amount of force used was reasonable under the circumstances."); *Chastain v. Civil Serv. Bd. of Orlando*, 327 So. 2d 230, 232 (Fla. 4th DCA 1976) (noting that in the context of civil liability, "a police officer has the authority to use deadly force to apprehend an escaping prisoner when the use of such force is reasonably necessary under the circumstances"); *City of Miami v. Albro*, 120 So. 2d 23, 26 (Fla. 3d DCA 1960) ("The limit of the force to be used by the police is set at the exercise of such force as reasonably appears necessary . . . .").

If the objective reasonableness of the use of deadly force is the only requirement for asserting the defense under Section 776.05(1), that requirement is satisfied for the reasons discussed *supra* part II.A.  Further, assuming as Plaintiff argues that the defense under Section 776.05(1) requires

an officer to subjectively believe that the use of deadly force was reasonable, Officer Denicola's

undisputed testimony explaining why she shot Btesh satisfies that requirement.  Officer Denicola

stated that she felt she "had no other choice" but to shoot Btesh given Btesh' failure to obey

commands, Btesh's angry demeanor, that she was responding to an alleged sexual battery, that the

victim appeared to have been battered, that Btesh had locked Officer Payne outside the apartment,

and that Btesh was walking toward her in an aggressive manner with his hands clasped in front of

his chest.  (Doc. No. 105-11 at 9.)  For the reasons discussed *supra* part II.A, Officer Denicola's

subjective belief in the appropriateness of deadly force was reasonable.  Therefore, even under

Plaintiff's proposed interpretation of Section 776.05(1), that statutory defense to a state law battery

claim applies based on undisputed evidence of record, and Officer Denicola is entitled to summary

judgment on the battery claim in Count VII.

In addition, Officer Denicola is entitled to summary judgment on the instant battery claim

because she is immune from liability under Section 768.28(9)(a), Florida Statutes, which provides

Officer Denicola immunity from tort claims so long as she did not act "in bad faith or with malicious

purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property."

"Bad faith" under Section 768.28(9)(a) has been equated with "actual malice," which requires proof

of an "evil intent or motive."  *Olson v. Johnson*, 961 So. 2d 356, 359 (Fla. 2d DCA 2007); *Parker

v. Fla. Bd. of Regents*, 724 So. 2d 163, 167 (Fla. 1st DCA 1998).  In addition, "the phrase 'wanton

and willful disregard' connotes conduct much more reprehensible and unacceptable than mere

intentional conduct." *Richardson v. City of Pompano Beach*, 511 So. 2d 1121, 1123 (Fla. 4th DCA

1987).  Because Officer Denicola's use of deadly force on Btesh was objectively reasonable, *see

supra* part II.A, and because her subjective motives of record do not permit any reasonable inference

of evil intent or reprehensible conduct, she is entitled to immunity under Section 768.28(9)(a). *See Pace v. City of Palmetto*, 489 F. Supp. 2d 1325, 1336 (M.D. Fla. 2007) (granting sovereign immunity to a police officer on a battery claim arising from an allegedly excessive use of force during an arrest because the officer's actions were objectively reasonable under the totality of the circumstances). Accordingly, the Court will enter summary judgment in favor of Officer Denicola and against Plaintiff on the claim for  battery in Count VII.

## IV.  Count I:  Section 1983 Claim Against Maitland for Failure to Train Officers

In Count I of the Second Amended Complaint, Plaintiff contends that the City of Maitland is liable under Section 1983 for failure to train and supervise police officers in the proper use of force and in handling situations involving mentally disabled persons, which resulted in the violation of Btesh's constitutional rights.  (Doc. No. 72 at 18-21.)  Plaintiff further asserts that the City of Maitland is liable for failing to train police officers to flag the residences of mentally ill persons. (Doc. No. 124 at 16-18.)  These claims are based on the theory of municipal liability stated in *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), under which a municipality may be liable for an official custom or policy which results in the deprivation of an individual's constitutional rights.  *Id.* at 690; *see also Garczynski*, 573 F.3d at 1170 ("If a city employee violates another's constitutional rights, the city may be liable if it had a policy or custom of failing to train its employees and that failure to train caused the constitutional violation." (quoting *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 123 (1992))).

As discussed below, the City of Maitland is entitled to summary judgment on this count because Officers Denicola and Payne did not violate Btesh's constitutional rights or, alternatively, because no evidence of record supports Plaintiff's contentions that the City of Maitland was

deliberately indifferent to the training and supervision of its police officers.

### A.  Individual Officers' Actions Preclude Municipal Liability Under Section 1983

Absent any evidence that an individual police officer employed by the City of Maitland violated Btesh's constitutional rights, the City of Maitland cannot be liable to Btesh under Section 1983 for a municipal policy or custom of failing to train or supervise that police officer.  *See Garczynski*, 573 F.3d at 1170 ("Analysis of a [municipal] entity's custom or policy is unnecessary . . . when no constitutional violation has occurred."); *Case v. Eslinger*, 555 F.3d 1317, 1328 (11th Cir. 2009) (noting that a municipality is not liable under *Monell* where the individual officer involved inflicted no constitutional harm (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986))); *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996) ("Since we have determined that Deputy Watson's conduct did not cause the Rooneys to suffer a constitutional deprivation, we need not inquire into Volusia County's policy and custom relating to patrol vehicle operation and training.").  Because the Court has found that Officer Denicola is not individually liable under Section 1983 for shooting Btesh, *see supra* part II.A, the City of Maitland cannot be liable under Section 1983 for the shooting of Btesh based on a custom or policy of improper training or supervision of Officer Denicola.

In arguing that the City of Maitland is liable for the shooting of Btesh under Section 1983, Plaintiff claims that Officer Payne's actions in responding to the suspected rape at Btesh's residence were the "moving force" behind the deprivation of Btesh's constitutional rights.  (Doc. No. 124 at 10.)  To the extent Plaintiff seeks to hold the City of Maitland liable under Section 1983 based on Officer Payne's actions, that argument fails because Officer Payne did not violate Btesh's constitutional rights or, alternatively, because Officer Payne's actions did not proximately cause

Btesh's injuries.

Plaintiff concedes that Officer Payne did not shoot Btesh.  (Doc. No. 105 at 5.)  Therefore, Officer Payne may only be liable under Section 1983 for Btesh's injuries based on a failure to intervene, which requires Plaintiff to prove that: (1) Officer Denicola used excessive force; and (2) Officer Payne was in a position to intervene yet failed to do so.  *Crenshaw v. Lister*, 556 F.3d 1283, 1293-94 (11th Cir. 2009).  As discussed *supra* part II.A, Officer Denicola's shooting of Btesh was justified, and it is undisputed that Officer Payne was locked outside the apartment at the moment Officer Denicola shot Btesh.  (Doc. No. 105-10 at 28-29; Doc. No. 124-3 at 5.)  Therefore, Officer Payne cannot be held liable under Section 1983 for the shooting of Btesh, and the City of Maitland cannot be held liable under Section 1983 based on a failure to train or supervise Officer Payne. *Case*, 555 F.3d at 1328.

Alternatively, because Officer Payne's conduct did not proximately cause Btesh's injuries, there is not a sufficient causal connection between the City of Maitland's alleged unlawful failure to take action in response to Officer Payne's reported performance deficiencies and Btesh's injuries to hold the City of Maitland liable under Section 1983.  *See Best v. Cobb Cnty., Ga.*, 239 F. App'x 501, 504-05 (11th Cir. 2007) (affirming summary judgment for a municipality and a police chief where the plaintiff failed to show "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation" (quoting *City of Canton*, 489 U.S. at 385)).  "A § 1983 claim requires proof of an affirmative causal connection between the defendant's acts or omissions and the alleged constitutional deprivation."  *Troupe v. Sarasota Cnty., Fla.*, 419 F.3d 1160, 1165 (11th Cir. 2005) (citing *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986))).  This requisite causation includes proof of proximate causation.  *See Jackson v. Sauls*, 206 F.3d 1156, 1168 (11th

Cir. 2000) ("For damages to be proximately caused by a constitutional tort, a plaintiff must show that, except for that constitutional tort, such injuries and damages would not have occurred and further that such injuries and damages were the reasonably foreseeable consequences of the tortious acts or omissions in issue.").

"The causal relation does not exist when the continuum between [a police officer's] action and the ultimate harm is occupied by the conduct of deliberative and autonomous decision-makers." *Troupe*, 419 F.3d at 1166 (quoting *Dixon v. Burke Cnty.*, 303 F.3d 1271, 1275 (11th Cir. 2002)). For example, where a suspect continues fleeing in a vehicle after being shot by a police officer, a subsequent car crash killing the getaway vehicle passengers was not proximately caused by the shooting because the suspect's flight following the shooting "was the intervening cause" of the passengers' deaths. *Id.*

Similarly, Btesh's actions between the time Officer Payne backed out of the apartment and Officer Denicola's shooting of Btesh preclude a reasonable inference of an affirmative causal connection between Officer Payne's actions and the shooting. As Officer Payne walked backwards from a quickly and aggressively approaching Btesh, she walked outside the front door to Btesh's apartment, and Btesh shut and locked the front door. (Doc. No. 124-3 at 3.) Btesh then quickly and aggressively walked toward Officer Denicola and failed to obey her commands, at which point he was shot by Officer Denicola. (Doc. No. 105-10 at 28-29; Doc. No. 105-11 at 7-8.) Btesh's autonomous conduct between the time Officer Payne backed out of the apartment and the moment he was shot by Officer Denicola precludes a finding that Officer Payne's conduct proximately

caused Btesh's injures.[30]  *See Troupe*, 419 F.3d at 1166 (finding no sufficient causal relation between an officer's conduct and the plaintiff's injuries where the continuum between the officer's action and the ultimate harm was "occupied by the conduct of deliberative and autonomous decision-makers"); *LaMarca v. Turner*, 995 F.2d 1526, 1538 (11th Cir. 1993) ("Section 1983 [] focuses [the] inquiry on whether an official's acts or omissions were the cause–not merely a contributing factor–of the constitutionally infirm condition.").   Absent a proximate causal connection between Officer Payne's conduct and Btesh's injuries, any deliberate indifference by the City of Maitland to Officer Payne's reported performance deficiencies and her presence as a backup officer responding to Btesh's residence cannot reasonably be considered a proximate cause of Btesh's injuries.

In summary, given that neither Officer Denicola nor Officer Payne is individually liable for violating Btesh's constitutional rights, the City of Maitland is entitled to summary judgment on the Section 1983 municipal liability claim in Count I of the Second Amended Complaint.  Alternatively,

---

[30] Andrew Scott opined that Officer Payne's retreat out of the apartment "in [Officer Denicola's] mind[] was the trigger that caused [Officer Denicola] to use deadly force, as stated in her deposition."  (Doc. No. 119-27 at 1.)  Officer Denicola made no such statement during her deposition, and the evidence of record does not permit a reasonable inference that Officer Payne's actions were "the trigger" causing Officer Denicola to deploy deadly force.  Although Officer Denicola stated that she was "afraid" due to the fact that Btesh had "cut [her] off" from her backup officer, (Doc. No. 105-10 at 30), Officer Denicola testified that the fact that Btesh had locked Officer Payne out of the apartment was merely one of several factors she considered when deciding to deploy deadly force on Btesh.  (Doc. No. 105-11 at 9.)  Officer Denicola stated that her decision to use deadly force on Btesh was occasioned not only by Officer Payne's position locked outside the apartment, but also by Btesh's failure to obey commands, Btesh's angry demeanor, that she was responding to an alleged sexual battery, that the victim appeared to have been battered, and that Btesh walked toward her in an aggressive manner with his hands clasped in front of his chest.  (*Id.*)  Officer Denicola further asserted that she did not know whether her reaction would have been different had Officer Payne been present in the apartment at the time of the shooting.  (*Id.*)

even if Officer Denicola's use of deadly force on Btesh was unjustified, the City of Maitland is not liable for Btesh's injuries based on deliberate indifference to the training and supervision of Officer Payne because Officer Payne's actions did not proximately cause Btesh's injuries.

### B.  No Deliberate Indifference by the City of Maitland

Even if the actions of Officers Denicola and Payne in responding to the suspected rape at Btesh's residence did not preclude the City of Maitland from being liable under Section 1983 for the shooting of Btesh, the City of Maitland is entitled to summary judgment on this claim because the evidence of record viewed in the light most favorable to Plaintiff does not reasonably suggest that the City of Maitland was deliberately indifferent to a need for training and supervision of its police officers.  "A failure to adequately train [or supervise] municipal employees constitutes an actionable policy or custom for § 1983 purposes 'only where the failure to train [or supervise] amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact.'"  *Cook v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1116 (11th Cir. 2005).  "To establish . . . 'deliberate indifference,' a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action."  *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (citations omitted).  The requisite knowledge of the municipality may be shown by either (1) a history of "prior incident[s] in which constitutional rights were similarly violated," or (2) an "obvious" need for training or supervision.  *Id.* at 1351-52.

### 1.  History of Prior Incidents

Contrary to Plaintiff's arguments, the evidence of record does not reasonably suggest that City of Maitland knew that additional training and supervision of police officers were needed in the

58

areas of use of force, interacting with mentally ill suspects, or flagging residences for the presence

of mentally ill persons.  (Doc. No. 72 at 18-21; Doc. No. 124 at 16-18.)  With respect to the alleged

needs for training in the proper use of force and handling situations involving mentally disabled

persons, Plaintiff does not cite, and the Court does not find, any evidence of record of prior uses of

excessive force by members of the Maitland Police Department, let alone any prior uses of excessive

force against mentally ill persons by the Maitland Police Department.  Each of the 48 prior uses of

deadly force reviewed by Plaintiff's expert, Andrew J. Scott, III, were found justified by Chief

Calhoun.  (Doc. No. 124-15 at 9.)  Scott's testimony that 48 justified uses of deadly force was

"highly improbable," without identifying a single incident where he believed that the use of deadly

force was unreasonable, (*id.*), does not create a genuine issue of material fact regarding whether the

City of Maitland was on notice of a history of prior uses of excessive force.  *See Brooks v. Scheib*,

813 F.2d 1191, 1193 (11th Cir. 1987) (noting that despite ten citizen complaints about a police

officer, the city did not have any notice of past police misconduct because the plaintiff "never

demonstrated that [the] past complaints of police misconduct had any merit" and because "the

number of complaints bears no relation to their validity"); *Rada v. Miami-Dade Cnty.*, 2006 U.S.

Dist. Lexis 89510, at *20 (S.D. Fla. Dec. 7, 2006) (finding that seven shootings of mentally ill

persons between 2002 and 2005, all of which were lawful, did not place the county on notice of prior

violations of constitutional rights).

The fact that the Maitland Police Department previously responded to emergency calls from

Btesh's residence and documented his mental condition is not probative of whether the City was on

notice of any prior violations of constitutional rights, as there is no evidence that the prior incidents

at Btesh's residence resulted in constitutional injury to Btesh.  In addition, Plaintiff has failed to

59

identify a single incident in the City of Maitland prior to the shooting of Btesh where the failure to flag a mentally ill individual's address caused a violation of constitutional rights.

Plaintiff also argues that City of Maitland was deliberately indifferent for failing to discipline police officers for violating police policies and procedures. (Doc. No. 124 at 10-16.) However, Plaintiff has not identified a single Maitland police officer who violated policies and procedures and was not disciplined. The evidence of record shows that Officer Payne was placed on probation for six months by Chief Calhoun for violating several department policies as reported by her supervisors. (Doc. No. 124-7 at 1-3.) Although the evidence of record viewed in Plaintiff's favor permits an reasonable finding that the City of Maitland took no action to ensure that Officer Payne completed the terms of her special probation,[31] a single occasion where municipal officials failed ensure that the terms of special probation were fulfilled does not constitute deliberate indifference for which a municipality may be held liable. *See Craig v. Floyd Cnty., Ga.*, No. 10-13225, --- F.3d ----, 2011 WL 2437643 at *3 (11th Cir. June 20, 2011) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability against a municipality." (internal quotation omitted)).

In addition, Officer Payne's performance deficiencies did not reasonably notify the City of Maitland of a pattern of unlawful police conduct giving rise to a need for training or supervision of Officer Payne in areas substantially related to the shooting of Btesh. *See Gold*, 151 F.3d at 1351 ("[W]ithout notice of a need to train or supervise *in a particular area*, a municipality is not liable as a matter of law for any failure to train and supervise." (emphasis added)). Officer Payne was

---

[31] There is no evidence of record that Officer Payne fulfilled any condition of her special probation, including the requirement that she receive additional officer safety training, prior to her resignation in April 2009. (Doc. No. 105-4 at 20.)

found deficient in her report writing skills, diligence, demeanor, and officer safety skills, and she was placed on six months special probation which imposed remedial training in those areas.  (Doc. No. 124-4 at 1-5; Doc. No. 124-5 at 1-8.)  She was not found to be deficient in the use of force or dealing with mentally ill persons.

Although Officer Payne was found by Lieutenant Harris to have deficiently backed up other officers during an arrest on one occasion, (Doc. No. 124-5 at 8), Chief Calhoun disagreed that Payne's performance was deficient in that instance, (Doc. No. 105-3 at 22-23).  In any case, Payne's conduct during the disputed arrest, pointing her taser at a vehicle passenger through a glass window, (Doc. No. 124-5 at 8), was materially dissimilar to her actions in responding to Btesh's residence on December 22, 2008.  Therefore, Officer Payne's presence as a backup officer at the time Btesh was shot, despite her one prior failure to backup other officers to the satisfaction of Lieutenant Harris, does not reasonably permit a finding of deliberate indifference by the City of Maitland to Btesh's constitutional rights resulting from a failure to train or supervise police officers.  *See Mercado*, 407 F.3d at 1162 (granting summary judgment for the city on a municipal liability claim where none of the prior incidents of excessive force in the city "involved factual situations . . . substantially similar to the case at hand").

### 2.  Obvious Need for Training or Supervision

Absent any prior incidents similar to the shooting of Btesh in which constitutional rights were violated, liability for failure to train or supervise may only be predicated on an "obvious" need for training or supervision.  *See Gold*, 151 F.3d at 1352 (noting that Supreme Court caselaw leaves "open the possibility that a need to train could be so obvious" that a city could be liable without a pattern of prior constitutional violations).  "In leaving open . . . the possibility that a plaintiff might

succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations, [the Supreme Court] hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officials with specific tools to handle recurring situations." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 409 (1997).  The obviousness of the risk of constitutional violations from the failure to take action must be "obvious in the abstract" and not dependent upon the circumstances of the individuals involved in any particular case.  *Gold*, 151 F.3d at 1352 (quoting *Brown*, 520 U.S. at 410); *see also Brown*, 520 U.S. at 410 (holding that an isolated incident of a sheriff's inadequate screening of a deputy's job application did not create such an obvious risk that it alone established the municipality's deliberate indifference to the risk that the deputy would use excessive force). Further, "showing merely that additional training would have been helpful in making difficult decisions [or p]roving that an injury or accident could have been avoided if an employee had [] better or more training, sufficient to equip him to avoid the particular injury-causing conduct[,] will not suffice."  *Connick v. Thompson*, 131 S. Ct. 1350, 1363-64 (2011) (internal quotation omitted).

The need for training of police officers carrying firearms in the use of deadly force has been found to be obvious, while a need for training to recognize mental illness requiring hospitalization or to dispense medication as prescribed is not sufficiently obvious to warrant municipal liability absent a prior history of factually similar violations of constitutional rights.  *Compare City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n.10 (1989) (noting that there is an obvious need to train officers in the use of deadly force where firearms are provided to police officers), *with Young v. City of Augusta, Ga.*, 59 F.3d 1160, 1171-72 (11th Cir. 1995) (finding no obvious need to train jail guards "to recognize the need to remove a mentally ill inmate to a hospital or to dispense medication as

prescribed"); *see also Harris*, 489 U.S. at 396-97 (finding no obvious need for police officers to be trained in diagnosing mental illness) (O'Connor, J., concurring in part and dissenting in part).  If the risks of failing to train law enforcement officials "to recognize the need to remove a mentally ill inmate to a hospital or to dispense medication as prescribed" are not sufficiently obvious in the abstract, *Young*, 59 F.3d at 1171-72, it follows that the risk of failing to train police officers to flag the addresses of mentally ill persons is also insufficiently obvious in the abstract to impose municipal liability under Section 1983 absent a prior history of injuries resulting from a failure to flag residences.  *See Connick*, 131 S. Ct. at 1361 (noting that it is "rare" that "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations").  This conclusion is supported by the fact that Plaintiff does not cite, and the Court does not find, any federal case finding a municipality liable under Section 1983 for failing to flag the address of a mentally ill individual.

In any case, Plaintiff has not produced any evidence of record suggesting that the City of Maitland made a deliberate choice not to take any action to train or supervise police officers in the use of force, handling of situations involving mentally ill persons, or flagging residences of mentally ill persons, and thus the City of Maitland cannot be found to be deliberately indifferent to a need for training and supervision in those areas.  *See Gold*, 151 F.3d at 1350 ("To establish . . . 'deliberate indifference,' a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take *any* action." (emphasis added)).  To the contrary, undisputed evidence of record shows that the City of Maitland provided training and supervision prior to the shooting of Btesh in the use of force and the handling of situations involving mentally ill persons.  Officer Denicola received training in the use

63

of force and deadly force from the Maitland Police Department.[32]  (Doc. No. 105-1 at 37-38; Doc.

No. 105-11 at 27.)  The City of Maitland also took actions to manage police encounters with the

mentally ill prior to the shooting of Btesh by implementing a Crisis Intervention Team policy in

2001.  (Doc. No. 72-7 at 2.)  The fact that Officers Denicola and Payne were not CIT trained does

not reasonably permit a finding of deliberate indifference to training of police officers in how to

respond to situations involving mentally ill persons because it is undisputed that the CIT policy did

not require all Maitland police officer to become CIT trained, (Doc. No. 72-7 at 3), and because the

Maitland Police Department had previously provided Officer Denicola field training in responding

to calls involving mentally ill persons.  (Doc. No. 105-12 at 28); *see Rada*, 2006 U.S. Dist. Lexis

89510, at **21-22 (holding that a county's decision to provide a sixteen hour training course in lieu

---

[32] According to Officer Denicola's undisputed deposition testimony, she was trained prior to December 2008. by the Maitland Police Department in the various levels of the use of force and how to subdue an assailant without the use of deadly force (Doc. No. 105-11 at 27; Doc. No. 105-12 at 17-18.)  Officer Denicola testified that she was familiar with when to use certain levels of force based on the "use of force matrix."  (Doc. No. 105-11 at 24-25.)  She described the "use of force matrix" as a scale from one to five, with one being the lowest degree of force.  (*Id.* at 25.)  She also explained that level one was mere officer presence and that level two was yelling or giving verbal commands.  (*Id.* at 25-26.)  Officer Denicola stated that she contemplated the "use of force matrix" in her mind before firing upon Btesh and explained that she believed she "had no other choice" but to use deadly force under the circumstances.  (*Id.* at 26.)

Scott referenced Officer Denicola's inability to articulate the use of force continuum during her deposition in support of his opinion that Denicola was improperly trained.  (Doc. No. 119-31 at 11.)  This assertion does not create a genuine issue of material fact regarding whether Officer Denicola was properly trained, as any inability of Officer Denicola to articulate the use of force continuum during her deposition to the satisfaction of Scott at most shows that Officer Denicola did not learn her training perfectly, not that she was improperly trained by the City of Maitland.  *See Wynn v. City of Lakeland*, 727 F. Supp. 2d 1309, 1316-17 (M.D. Fla. 2010) (reasoning in the analysis of a summary judgment motion that when a shooting officer incorrectly states during a deposition what degree of force is permissible in a given situation, that statement at most reflects that the officer "did not learn his training perfectly," not that the city incorrectly trained the officer given the other evidence of record that the city actually provided the shooting officer training in the proper use of force).

of a forty hour CIT training course did not reasonably suggest an obvious failure to train). Moreover, the CIT policy itself did not require a CIT trained officer to be the first responder to calls involving the mentally ill, as the CIT policy plainly stated that "[i]n-progress calls will be dispatched to the closest unit and may be reassigned to the CIT officer when the situation has stabilized." (Doc. No. 72-7 at 3.)  Officer Doug Lawson, who was CIT trained, acknowledged the 9-1-1 dispatch to Btesh's residence and provided assistance to Btesh after the shooting and the scene was secured. (Doc. No. 105-12 at 30; Doc. No. 124-3 at 2, 7.)

Plaintiff also has failed to adduce any evidence reasonably suggesting that the City of Maitland's failure to have an address-flagging policy was the result of a deliberate choice not to take any action in this area.  Although Btesh's residence was not flagged at the time he was shot, some residences of mentally ill persons had been flagged by Maitland police officers at that time.  (Doc. No. 143-1 at 47-49.)  Jewel Methias stated that dispatch supervisors would flag addresses when requested by police officers.  (Doc. No. 132-1 at 68.)  According to Deputy Chief Manuel, there was an "unwritten rule" to flag residences, and he received training while a Maitland police officer to flag addresses.  (*Id.* at 7, 49-50.)  On the other hand, Office Denicola testified that prior to December 22, 2008, she had never requested that an address be flagged by dispatch, she had never been instructed on how to flag an address, and she had not responded to a call where dispatch told her the address was flagged.  (Doc. No. 105-12 at 23.)  The absence of a formal training program instructing police officers to flag addresses of mentally ill persons, by itself, does not permit a reasonable inference that the City of Maitland made a "deliberate choice not to take any action" with respect to training officers to flag the addresses of mentally ill persons.  *See AFL-CIO v. City of Miami, Fla.*, 637 F.3d 1178, 1189 (11th Cir. 2011) (noting that to hold a municipality liable under Section 1983,

"a plaintiff must [] establish that the city 'made a deliberate choice' not to train its employees").

In summary, even if Officer Denicola's use of deadly force on Btesh was unlawful, the City of Maitland was not deliberately indifferent to a need for training or supervision regarding the use of force, handling situations involving mentally ill persons, or flagging residences of mentally ill persons. Therefore, the City of Maitland is entitled to summary judgment on Count I.

## V. Count II: Section 1983 Claim Against Maitland for Failure to Train Dispatchers

In Count II of the Second Amended Complaint, Plaintiff contends that the City of Maitland is liable under Section 1983 for failing to properly train and supervise 9-1-1 dispatchers regarding the flagging of addresses of mentally ill individuals. (Doc. No. 72 at 21-25; Doc. No. 124 at 16-18.) The City of Maitland argues that it is entitled to summary judgment on this claim because it has no employment relationship with the 9-1-1 dispatchers employed by the City of Apopka and because there is no evidence of record that the City of Maitland was deliberately indifferent to a known need for training or supervision regarding the flagging of addresses of mentally ill individuals. (Doc. No. 105 at 12-13; Doc. No. 131 at 11-12.)

For the reasons discussed below, the Court finds that the absence of an employment relationship between the City of Maitland and 9-1-1 dispatchers precludes the City from being held liable under Section 1983 for failure to train or supervise. Alternatively, even if such a sufficient relationship for municipal liability existed between the City of Maitland and the 9-1-1 dispatchers, Plaintiff has failed to produce any evidence that the City of Maitland was deliberately indifferent to a need for training or supervision as required to hold a municipality liable under Section 1983.

### A. No Employment Relationship

A municipality cannot be liable under Section 1983 for failure to train where the

municipality did not employ the individuals allegedly requiring training. *See, e.g.*, *Banker v. Cnty. of Livingston*, No. 09-CV-6652 CJS, --- F. Supp. 2d ----, 2011 WL 1331253, at *6 (W.D.N.Y. Apr. 6, 2011) (finding that the plaintiff failed to state a Section 1983 municipal liability claim against a county based on a failure to train or supervise because the individual actor was employed by a non-profit agency, not the county); *Kelly v. City of St. Paul*, No. 09-461, 2010 WL 4272460, at *12 (D. Minn. Oct. 18, 2010) (dismissing a Section 1983 claim against the City of St. Paul for the actions of a police officer because that officer was employed by the City of Minneapolis, not St. Paul); *Bliven v. Hunt*, 478 F. Supp. 2d 332, 340 (E.D.N.Y. 2007) ("[B]oth Family Court judges and their court attorneys are not municipal employees; they are State employees. Defendant does not train or supervise these employees and therefore, cannot be held liable for any alleged failure to train and supervise.").

In October of 1999, the City of Maitland contracted with the City of Apopka pursuant to the Interlocal Agreement for the City of Apopka to receive all inbound emergency calls and dispatch those calls to the City of Maitland. (Doc. No. 72-1 at 19-26.) The Interlocal Agreement further provided that the City of Apopka would absorb up to five dispatchers from the City of Maitland and that such dispatchers would become employees of the City of Apopka and would no longer be considered employees of the City of Maitland. (*Id.* at 20.) It is undisputed that both Michelle McEachern and Jewel Methias, the 9-1-1 dispatchers involved in the dispatching of the Maitland Police Department to Btesh's residence on November 22, 2008, were employees of the City of Apopka at that time. (Doc. No. 132-1 at 7, 19.)

Plaintiff argues that the City of Maitland may be liable under Section 1983 for failing to train Methias and McEachern notwithstanding the absence of a formal employment relationship with the

City of Maitland because McEachern and Methias were apparent agents of the City of Maitland. (Doc. No. 124 at 18-19.)  The evidence of record cited by Plaintiffs does not create a genuine issue of material fact regarding the existence of an apparent agency relationship between the City of Maitland and McEachern or Methias.[33]  But even if such an apparent agency relationship existed, Plaintiff does not cite, and the Court does not find, any authority that a municipality may be liable for failure to train employees of another municipality based on the apparent agency of those employees.  Absent an employment relationship between the City of Maitland and the 9-1-1 dispatchers, the City of Maitland is entitled to summary judgment on the Section 1983 claim in Count II.

### B.  No Deliberate Indifference

Notwithstanding the absence of any employment relationship between the City of Maitland and the City of Apopka emergency dispatchers, the City of Maitland is not liable for failure to train

---

[33] "Florida courts 'have applied a three-prong test under general agency law in order to determine the existence of apparent agency: first, whether there was a representation by the principal; second, whether a third party relied on that representation; and, finally, whether the third party changed position in reliance upon the representation and suffered detriment.'"  *First Specialty Ins. Corp. v. 633 Partners, Ltd.*, 300 F. App'x 777, 789 (11th Cir. 2008) (quoting *Almerico v. RLI Ins. Co.*, 716 So. 2d 774, 777 (Fla. 1998)).  The same definition of apparent agency applies in claims arising under federal law.  *See, e.g., Cronin v. Wash. Nat'l Ins. Co.*, 980 F.2d 663, 667 (11th Cir. 1993).

Apparent agency must be based on representations of the principal, not the supposed agent, to the third party.  *Id.*  Thus, McEachern's statement to Ramirez informing her during the 9-1-1 call that she had called the Maitland Police Department cannot establish an apparent agency.  Plaintiff also contends that an apparent agency was created by Maitland Police Department patrol vehicles prominently displaying instructions to call 9-1-1 in an emergency, but no evidence of record shows that Castelblanco or Ramirez relied upon the instructions on a Maitland police car in calling 9-1-1 to seek emergency assistance.  Finding no other arguments or evidence on this matter, Plaintiff has failed to meet his burden of producing evidence reasonably suggesting that there is an apparent agency between the City of Maitland and the City of Apopka 9-1-1 dispatchers.

or supervise the dispatchers because no evidence of record reasonably indicates that the City of Maitland was deliberately indifferent to a need for training or supervision of 9-1-1 dispatchers regarding the flagging of addresses of mentally ill individuals.  A municipality may be held liable for the actions of an employee only when an official policy of the municipality amounting to deliberate indifference causes a constitutional violation.  *Gold*, 151 F.3d at 1350.  The requisite deliberate indifference may be shown by a deliberate choice not to take any action and either (1) a history of prior incidents in which constitutional rights were similarly violated, or (2) an obvious need for training or supervision.  *Id.* at 1351-52.  Neither form of deliberate indifference can reasonably be inferred from the evidence of record.

There is no evidence of record of any prior constitutional injuries resulting from the failure to flag the residence of a mentally ill individual, let alone any evidence of uses of excessive force against mentally ill suspects or persons requiring emergency services in the City of Maitland prior to December 22, 2008.  *See supra* part IV.B.1.  Further, Chief Calhoun asserted that from December 2003 when he became Maitland Police Chief to the date Btesh was shot, there were no incidents where a citizen was harmed or injured as a result of an error in the dispatching of a police officer by the dispatch center.  (Doc. No. 114 at 12.)  The mere fact that 9-1-1 operators had previously dispatched calls for emergency services to Btesh's residence does not suggest deliberate indifference to a need for training or supervision of 9-1-1 operators absent any constitutional injury resulting from such incidents.  *See Gold*, 151 F.3d at 1351 ("[W]ithout notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise.").  Finding no evidence of record of any prior violations of constitutional rights placing the City of Maitland on notice of a need to train or supervise of 9-1-1 dispatchers regarding the

flagging of residences of mentally ill individuals, liability for failure to train or supervise 9-1-1 dispatchers can only be predicated on an "obvious" need for training or supervision.  *Id.* at 1352.

As discussed *supra* part IV.B.2, a need for training or supervision regarding the flagging of residences of mentally ill individuals is not sufficiently obvious to place the City of Maitland on notice of a need for such training or supervision absent prior injuries resulting from the failure to flag addresses.  Moreover, even if the need for training of 9-1-1 dispatchers to flag residences of the mentally ill was obvious, there is no evidence of record permitting a reasonable inference that the City of Maitland made a deliberate choice not to provide such training or supervision as required to hold the City liable for deliberate indifference.  *See Gold*, 151 F.3d at 1350 ("To establish . . . 'deliberate indifference,' a plaintiff must present some evidence that . . . the municipality made a deliberate choice not to take any action." (citations omitted)).

Although Btesh's residence was not flagged on December 22, 2008, the undisputed testimony of Deputy Chief of Police and Commander of Operations David Manuel indicates that residences of mentally ill persons had been flagged prior to the shooting of Btesh.  (Doc. No. 143-1 at 48.)  It is also undisputed that residences were flagged by 9-1-1 dispatchers only upon the request of police officers, (Doc. No. 132-1 at 68; Doc. No. 105-5 at 6), and Plaintiff does not offer any evidence of record reasonably suggesting that the City of Maitland contemplated and rejected any proposal for 9-1-1 dispatchers to flag residences for the presence of mentally disabled individuals without police instruction.  Therefore, even if the City of Maitland could be liable for the failure to train 9-1-1 dispatchers not in its employ, the City of Maitland is entitled to summary judgment on the Section 1983 claims in Count II because there is no evidence of record of deliberate indifference to the training or supervision of 9-1-1 dispatchers.

70

## VI.  Count V:  Section 1983 Claim Against Police Chief Gary Calhoun

In Count V of the Second Amended Complaint, Plaintiff seeks to hold Chief Calhoun individually liable under Section 1983 for his failure to adequately train and supervise Maitland police officers, which allegedly resulted in the deprivation of Btesh's constitutional rights.  (Doc. No. 72 at 27-29.)  Chief Calhoun contends that he cannot be individually liable under Section 1983 because Officer Denicola lawfully used deadly force on Btesh.  (Doc. No. 114 at 5.)  The Court agrees, and for completeness, the Court also finds that Chief Calhoun's supervisory actions do not subject him to Section 1983 liability even if the shooting of Btesh constituted excessive use of force.

### A.  No Supervisory Liability Because Individual Officers Acted Lawfully

It is well-settled that a supervisor cannot be held individually liable under Section 1983 absent a finding that a subordinate officer is liable for inflicting constitutional injuries.  *See, e.g.*, *Howell v. City of Lithonia*, 397 F. App'x 618, 621 (11th Cir. 2010) ("Because [the arresting officer] committed no constitutional violation, [the plaintiff] cannot show a basis on which to establish municipal liability against the [c]ity or supervisory liability against [the police chief].");  *Beshers v. Harrison*, 495 F.3d 1260, 1264 n.7 (11th Cir. 2007) ("We need not address the Appellant's claims of municipal or supervisory liability since we conclude that no constitutional violation occurred." (citations omitted));  *Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999) (granting summary judgment for a prison warden and a psychiatrist on Section 1983 supervisory liability claims as there was no evidence of an underlying constitutional violation by a mental health professional).  Because the individual actions of Officers Denicola and Payne did not violate Btesh's constitutional rights, *see supra* part IV.A, Chief Calhoun cannot be individually liable under Section 1983 in his supervisory capacity, and Chief Calhoun is entitled to summary judgment on the Section 1983 claim

71

in Count V of the Second Amended Complaint.

### B.  Chief Calhoun's Actions

Even if Officer Denicola's shooting of Btesh was unreasonable, Chief Calhoun is entitled to qualified immunity on the Section 1983 claim against him in his supervisory capacity.  Officers facing supervisory liability claims based on discretionary actions[34] are also entitled to qualified immunity unless the plaintiff proves a violation of a clearly established constitutional right.  *Harper v. Lawrence Cnty., Ala.*, 592 F.3d 1227, 1235-36 (11th Cir. 2010).  As discussed below, the evidence of record viewed in Plaintiff's favor does not permit a reasonable finding that Chief Calhoun violated Btesh's constitutional rights, and in any case, Plaintiff has not identified any caselaw clearly establishing that Chief Calhoun's conduct of record violated Btesh's clearly established rights.

### 1.  No Violation of Btesh's Constitutional Rights by Chief Calhoun

Supervisory officials cannot be held liable under Section 1983 for the unconstitutional actions of their subordinates based on the doctrine of *respondeat superior*.  *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1308 (11th Cir. 2006) (citation omitted).  Rather, "[a] supervisor can be held liable for the actions of his subordinates under § 1983 if he personally participates in the act that causes the constitutional violation or where there is a causal connection between his actions and the constitutional violation that his subordinates commit."  *AFL-CIO*, 637 F.3d at 1190 (citing *Braddy v. Fla. Dep't of Labor and Emp't Sec.*, 133 F.3d 797, 802 (11th Cir. 1998)).  There is no

---

[34] Chief Calhoun's alleged failure to train and supervise police officers is a matter within his discretionary authority.  *See Rich*, 841 F.2d at 1564 (defining discretionary authority to include actions undertaken pursuant to the performance of duties that are within the scope of an officer's authority); *Herrick v. Carroll Cnty., Ga.*, No. 1:09-CV-0161-JEC, 2009 WL 3094843, at *9 (N.D. Ga. Sept. 28, 2009) (finding that a county sheriff was acting within his discretionary authority with respect to the training and supervision of subordinates employed at the county jail).

evidence of record that Chief Calhoun personally participated in the shooting of Btesh.  Therefore, Chief Calhoun cannot be held liable under Section 1983 unless there is a causal connection between Chief Calhoun actions and Btesh's injury.

"The necessary causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so."  *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (internal quotation omitted). "Alternatively, the causal connection may be established when a supervisor's custom or policy results in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so."  *Id.* (internal quotations and alterations omitted). "The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous."  *Id.* at 1360-61 (quotation omitted).  For the reasons discussed below, the evidence of record does not permit a reasonable finding that Chief Calhoun's alleged wrongdoings were causally connected to Btesh's injuries.

### a.  History of Widespread Abuse / Custom of Deliberate Indifference

Plaintiff's arguments for holding Chief Calhoun liable under Section 1983 based on deliberate indifference resulting from a history of widespread abuse or a custom or policy are identical to the arguments the Court rejected with respect to municipal liability of the City of Maitland.  (*Compare* Doc. No. 124 at 9-18, *with* Doc. No. 133 at 8-17.)  As discussed in the context of municipal liability, *see supra* part IV.B, Plaintiff has failed to produce any evidence of prior violations of constitutional rights materially similar to the alleged wrongful shooting of Btesh or any evidence that Chief Calhoun or any Maitland official was deliberately indifferent to the need for

training or supervision of Maitland police officers.  Finding no arguments by Plaintiff that Chief Calhoun is liable based on a history of widespread abuse or a custom or policy of deliberate indifference that were not raised and rejected in the context of municipal liability against the City of Maitland, Chief Calhoun is not liable for the shooting of Btesh on these grounds.

### b.  Directing or Knowing Subordinates Would Act Unlawfully

Unlike a claim of municipal liability under Section 1983, a claim of supervisory liability under Section 1983 can arise from "facts support[ing] an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Cottone*, 326 F.3d at 1360.  Plaintiff does not argue, and there is no evidence of record suggesting, that Chief Calhoun directed Officers Denicola and Payne to act in any particular manner on December 22, 2008.  With respect to holding Chief Calhoun liable for failing to stop the conduct of Officers Denicola and Payne, Plaintiff must present evidence creating a genuine issue of material fact that Chief Calhoun "(1) ha[d] the ability to prevent or discontinue a *known constitutional violation* by exercising his or her authority over the subordinate who commits the constitutional violation, and (2) subsequently fail[ed] to exercise that authority to stop it." *Keating v. City of Miami*, 598 F.3d 753, 765 (11th Cir. 2010) (emphasis added).

There is no record evidence reasonably permitting a finding that Chief Calhoun actually knew of the conduct that Officers Payne and Denicola would take in responding to the emergency call of a suspected rape at Btesh's residence such that he could reasonably be found to have "the ability to prevent or discontinue a known constitutional violation."  *Cf. Keating*, 598 F.3d at 765 ("[B]ecause [supervisory police officials] knew that the subordinate officers would engage in unlawful conduct in violation of the Protesters' First Amendment rights by directing such unlawful

acts, they also violated the Protesters' First Amendment rights by failing to stop such action in their supervisory capacity."); *Doe v. Autauga Cnty. Bd. of Educ.*, No. 2:04-cv-1155-WKW, 2007 WL 3287347 at *9 (M.D. Ala. Nov. 5, 2007) ("The standard is not that [the supervisor] should have known the violation would occur.  The standard is that he did know the violation would occur."). Chief Calhoun was at home at the time of the shooting of Btesh and responded to the scene after receiving a telephone call from Deputy Chief Manuel informing him of the shooting.  (Doc. No. 105-5 at 13-14.) Further, Chief Calhoun's knowledge of Officer Payne's prior negative performance evaluations does not permit a reasonable inference that Chief Calhoun actually knew that Btesh would be shot if Officer Payne responded to the suspected rape call at Btesh's residence, as Officer Payne's conduct was not a proximate cause of Btesh's injuries.  *See supra* part IV.A.  Accordingly, Chief Calhoun is not liable under Section 1983 for the shooting of Btesh.

### 2.  No Violation of Clearly Established Rights

In addition, Chief Calhoun is entitled to summary judgment and qualified immunity on the Section 1983 claim against him for failing to supervise Officers Denicola and Payne because Plaintiff has not cited, and the Court does not find, any clearly established law indicating that Chief Calhoun's failure to prevent Officers Denicola or Payne from responding to Btesh's residence in the manner they did would subject him to liability for Btesh's injuries under Section 1983.  Accordingly, Chief Calhoun is entitled to qualified immunity and summary judgment on the Section 1983 claim against him in Count V.

## VII.  Count VI: Battery Against City of Maitland

In Count VI of the Second Amended Complaint, Plaintiff claims that the City of Maitland is liable for Officer Denicola's alleged battery of Btesh.  (Doc. No. 72 at 29-30.)  Because Officer

Denicola is not liable for battery, *see supra* part III, the City of Maitland cannot be liable for the battery of Btesh and is entitled to summary judgment on this claim. *See Wynn*, 727 F. Supp. 2d at 1315 (noting that if a police officer's use of deadly force is justified, the city employing the police officer is not liable for battery under Florida law).

## VIII.  Counts X-XII:  Negligence Against City of Maitland

The City of Maitland moves for summary judgment on Plaintiff's claims in Counts X-XII that the City is liable for (1) Officer Denicola's allegedly negligent use of excessive force on Btesh; (2) negligently hiring, retaining, training, and supervising of Officers Payne and Denicola; (3) negligently hiring, retaining, training, and supervising 9-1-1 operators and dispatchers; and (4) Chief Calhoun's negligent failure to ensure that only properly trained and qualified officers responded to calls involving mentally ill persons.  (Doc. No. 119 at 11-18.)  As discussed below, each of these claims fail on the merits.

### A.  Negligent Use of Excessive Force on Btesh by Officer Denicola

The City of Maitland argues that it is entitled to summary judgment on Plaintiff's claim that the City is liable for the negligent use of excessive force by Officer Denicola because Florida law does not permit a cause of action for negligent use of excessive force.  (Doc. No. 119 at 16.)  The Court agrees.  *See City of Miami v. Sanders*, 672 So. 2d 46, 48 (Fla. 3d DCA 1996) ("[I]t is not possible to have a cause of action for 'negligent' use of excessive force because there is no such thing as the 'negligent' commission of an 'intentional' tort."); *accord Lewis v. City of West Palm Beach, Fla.*, 561 F.3d 1288, 1294 (11th Cir. 2009).  Finding no arguments by Plaintiff to the

contrary,[35] summary judgment shall be entered in favor of the City of Maitland and against Plaintiff on this claim.

### B. Negligent Hiring, Retention, Training, and Supervision of Denicola and Payne

Claims for negligent hiring, retention, training, and supervision of police officers may be asserted against the municipality employing those officers. *See, e.g.*, *Storm v. Town of Ponce Inlet*, 866 So. 2d 713, 717 (Fla. 5th DCA 2004) ("[N]egligent retention or supervision of police officers or deputies is a viable tort which could be brought against the state or a municipality in a proper case."). However, "in order to impose liability on an employer for such torts, a plaintiff must first show that he was injured by the wrongful act of an employee." *Tex. Skaggs, Inc. v. Joannides*, 372 So. 2d 985, 987 (Fla. 2d DCA 1979).

Because Plaintiff has not produced any evidence subjecting Officers Denicola or Payne to liability for the shooting of Btesh, *see supra* parts II, III, IV.A, VIII.A, the City of Maitland is not liable for negligently failing to hire, retain, train, and supervise Officer Denicola and Payne. *Joannides*, 372 So. 2d at 987. Further, even assuming that the City of Maitland improperly hired, retained, trained, or supervised Officer Payne, Officer Payne's actions were not a proximate cause

-----

[35] Although Florida recognizes a cause of action for the negligent handling of a firearm and the negligent decision to use a firearm separate and distinct from an excessive force claim, *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1263 (11th Cir. 2001), Plaintiff does not plead or assert those claims in his submission on the pending Motions for Summary Judgment. Plaintiff's assertion in the Second Amended Complaint that Officers Payne and Denicola "negligently failed to restrain [] Btesh when they knew or should have known that [] Btesh was mentally handicapped," (Doc. No. 72 ¶ 140), fails to state a claim for negligence separate from the claim of negligent use of excessive force. *See Sanders*, 672 So. 2d at 48 (providing that "a separate negligence claim based upon a distinct act of negligence may be brought against a police officer in conjunction with a claim for excessive use of force" so long as that claim "pertain[s] to something other than the actual application of force during the course of the arrest"); *id.* ("[T]he sole basis and limit of an arresting officer's liability in making a lawful arrest is founded on a claim of battery, in that excessive force was involved in making the arrest.").

of Btesh's injuries, *see supra* part IV.A, and thus, Btesh cannot hold the City of Maitland liable for

negligently hiring, retaining, training, or supervising Officer Payne. *See Watson v. City of Hialeah*,

552 So. 2d 1146, 1149 (Fla. 3d DCA 1989) (noting in the context of a negligent retention claim that

"proximate cause is an essential element which must be pleaded and proved in any cause of action

in tort for negligence, and plaintiff's injuries here must be shown to have been brought about by

reason of the employment of the incompetent servant." (citation and emphasis omitted)); *Joannides*,

372 So. 2d at 987 ("[I]n order to impose liability on an employer for such torts [as negligent hiring,

retaining, training, or supervision], a plaintiff must first show that he was injured by the wrongful

act of an employee."). Accordingly, the City of Maitland is entitled to summary judgment on

Plaintiff's negligent hiring, retention, training, and supervision claims.

**C. Negligent Hiring, Retention, Training, and Supervision of 9-1-1 Operators and Dispatchers**

To prevail on a claim for negligent hiring, retention, training, or supervision, the plaintiff

must demonstrate injury caused by an employee, not merely an agent, of the defendant. *See, e.g.*,

*Pierson v. Orlando Reg'l Healthcare Sys., Inc.*, 619 F. Supp. 2d 1260, 1286 (M.D. Fla. 2009);

*Anderson Trucking Serv., Inc. v. Gibson*, 884 So. 2d 1046, 1052 n.2 (Fla. 5th DCA 2004);

*Joannides*, 372 So. 2d at 987. In October of 1999, the City of Maitland contracted with the City of

Apopka pursuant to the Interlocal Agreement for the City of Apopka to handle all inbound

emergency calls and dispatching for the City of Maitland. (Doc. No. 72-1 at 19-26.) The Interlocal

Agreement further provided that the City of Apopka would absorb up to five dispatchers from the

City of Maitland and that such dispatchers would become employees of the City of Apopka and

would no longer be considered employees of the City of Maitland. (*Id.* at 20.) It is undisputed that

both Michelle McEachern and Jewel Methias, the 9-1-1 dispatchers involved in the dispatching of the Maitland Police Department to Btesh's residence on November 22, 2008, were employees of the City of Apopka at that time.  (Doc. No. 132-1 at 7, 19, 31.)  Finding no evidence of record that any 9-1-1 operators and dispatchers were employed by the City of Maitland at the time Btesh was shot, the City of Maitland is entitled to summary judgment on Plaintiff's claim that the City negligent hired, retained, trained, and supervised 9-1-1 operators and dispatchers.

**D.  Permitting Improperly Trained Officers to Respond to Calls Involving Mentally Ill Persons**

Plaintiff contends that the City of Maitland is liable for Chief Calhoun's failure to ensure that only properly trained and qualified officers responded to calls involving mentally ill persons like Btesh.  (Doc. No. 72 ¶¶ 144-45.)  In order to hold the City liable based on Chief Calhoun's deficient supervision of police officers, Plaintiff must prove that Chief Calhoun's conduct resulted in injury to Btesh due to the wrongful act of an officer.  *Joannides*, 372 So. 2d at 987.  As discussed *supra* part X.B, Plaintiff has not met his burden of producing evidence from which Officers Payne or Officer Denicola could reasonably be found to have unlawfully caused Btesh's injuries.  Therefore, Plaintiff cannot recover damages from the City of Maitland for Chief Calhoun's alleged failure to ensure that properly trained and qualified officers respond to calls involving mentally ill persons like Btesh, and the City of Maitland is entitled to summary judgment on this claim.

**IX.  Count XIII: Breach of Interlocal Agreement by the City of Maitland**

Plaintiff asserts that Btesh is a third-party beneficiary to the Interlocal Agreement and that the City of Maitland breached the following provisions of the Interlocal Agreement:

a.  Failing to maintain non-delegable duty to control [the City of Maitland's] communication system;

b. Failing to receive training on how to utilize [the City of Mailtand's] computer aided dispatch, calls for service, and associated management record report systems;

c.  Failing to receive instruction and training in proper radio communication procedures; and

d.  Failing to provide computers and/or computer accessories to be utilized by [the City of Maitland's] personnel, including police officers, which will allow access to [the City of Maitland's] computer aided dispatch, calls for service, and associated management records reports.

(Doc. No. 72 ¶ 156.)  The City of Maitland has moved for summary judgment on this claim, arguing that Btesh is not a third-party beneficiary to the Interlocal Agreement and that there is no evidence of record that the City breached the Interlocal Agreement as alleged in the Second Amended Complaint.  (Doc. No. 105 at 13-18.)  Both arguments are well-taken.

## A.  Btesh as a Third-Party Beneficiary

"Under Florida law, a third party may enforce an agreement between others only if [the third party] is an intended beneficiary, not an incidental beneficiary, of that agreement."  *Maccaferri Gabions, Inc. v. Dynateria Inc.*, 91 F.3d 1431, 1441 (11th Cir. 1996) (citing *Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 279 (Fla. 1985)).  "[A] party is an intended beneficiary only if the parties to the contract clearly express, or the contract itself expresses, an intent to primarily and directly benefit the third party.'"  *Id.*  (quoting *Caretta Trucking, Inc. v. Cheoy Lee Shipyards, Ltd.*, 647 So. 2d 1028, 1031 (Fla. 4th DCA 1994).  "It is not necessary that the third party be specifically named.  It is sufficient if the claimant is a member of the *limited class* which was intended to benefit from the contract."  *Technicable Video Sys., Inc. v. Americable of Greater Miami, Ltd.*, 479 So. 2d 810, 812 (Fla. 3d DCA 1985) (emphasis added).

Because the Interlocal Agreement does not specifically name Btesh as an intended

beneficiary, Btesh may only be considered a third-party beneficiary if he is a member of a "limited class which was intended to benefit from the contract." *Id.* The emergency services established in the Interlocal Agreement inure to Btesh as a member of the general public requesting emergency services within the City of Maitland.[36] Membership in a class tantamount to the general public is not sufficiently limited to vest a person with the status of an intended, as opposed to incidental beneficiary, of a public contract. *Compare Haynes v. Dep't of Lottery*, 630 So. 2d 1177, 1180 (Fla. 1st DCA 1994) (rejecting a claim that individual lottery ticket purchasers are third-party beneficiaries to a contract between a private entity and the Florida Department of Lottery to sell lottery tickets to the public), *with Technicable Video Sys., Inc.*, 479 So. 2d at 812-13 (ruling that a minority-owned business was a third-party beneficiary of a contract between a city and a cable provider which required the cable provider to procure twenty percent of its expenditures from minority business enterprises). Because Btesh benefitted from the Interlocal Agreement solely as

---

[36] The Interlocal Agreement provides in its recitals that it "is for the benefit of the general public." (Doc. No. 72-1 at 19.) The Agreement further states in pertinent part that "Apopka shall dispatch Maitland police, public works, and fire personnel in response to '911' . . . requests" and that "Apopka shall maintain a numbered zone or other appropriate means of identification for calls within Maitland." (*Id.*) These provisions make clear that the Interlocal Agreement obligates the City of Apopka to dispatch calls for emergency services requested within the City of Maitland. In addition, the Interlocal Agreement was enacted pursuant to Chapter 163, Florida Statutes, known as the Florida Interlocal Cooperation Act of 1969, (Doc. No. 72-1 at 19), which permits:

> local governmental units to make the most efficient use of their powers by enabling them to cooperate with other localities on a basis of mutual advantage and thereby to provide services and facilities in a manner and pursuant to forms of governmental organization that will accord best with geographic, economic, population, and other factors influencing the needs and development of local communities.

§ 163.01(2), Fla. Stat. Finding no evidence of record to the contrary, the Interlocal Agreement was enacted for the benefit of the general public within the City of Maitland.

a member of the general public receiving emergency services within the City of Maitland, he was at most an incidental beneficiary to the Interlocal Agreement, and he cannot recover damages for breach of the Interlocal Agreement. *Maccaferri*, 91 F.3d at 1441.

**B. Duties of the City of Maitland Under the Interlocal Agreement**

Notwithstanding that Btesh is not a third-party beneficiary to the Interlocal Agreement, the City of Maitland is also entitled to summary judgment on Plaintiff's breach of contract claim because there is no evidence of record that the City of Maitland breached any provision of the Interlocal Agreement in responding to Btesh's residence on December 22, 2008. The City of Maitland's obligations under the Interlocal Agreement are set forth in Sections III and IV of the Agreement, (Doc. No. 72-1 at 20-21), and Plaintiff neither argues nor cites any evidence reasonably suggesting that any of those provisions were breached. Accordingly, the City of Maitland is entitled to summary judgment on the breach of contract claim in Count XII of the Second Amended Complaint.

**Conclusion**

Based on the foregoing, it is **ORDERED** and **ADJUDGED** that the First Motion for Partial Summary Judgment by Defendant City of Maitland, Florida (Doc. No. 105), the Motion for Summary Judgment by Defendant Rebecca Denicola (Doc. No. 113), the Motion for Summary Judgment by Defendant Gary Calhoun (Doc. No. 114), the Second Motion for Partial Summary Judgment by Defendant City of Maitland, Florida (Doc. No. 119), and the Motion to Strike Exhibit B of Plaintiff's Response in Opposition to City of Maitland's Motion for Partial Summary Judgment (Doc. No. 129) are **GRANTED**. The Clerk of Court is directed to enter judgment in favor of Defendants City of Maitland, Florida, Rebecca Denicola, and Gary Calhoun and against Plaintiff

Alberto D. Btesh on Counts I-III, V-VII, and X-XIII of the Second Amended Complaint, terminate

all pending motions, and close the case.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on July 28, 2011.


PATRICIA C. FAWSETT, JUDGE
UNITED STATES DISTRICT COURT


Copies furnished to:

Counsel of Record